Justice Ingrid Gustafson delivered the Opinion of the Court.
*598 ***286 ¶ 1 Jessy Lee Williams (Williams) appeals from the September 9, 2016 final Judgment entered by the Thirteenth Judicial District Court, Yellowstone County, pursuant to jury verdict finding Williams guilty of Count I, Sexual Intercourse Without Consent (SIWOC) (a felony); Count II, Aggravated Burglary (a felony); and Count III, Aggravated Assault (a felony). We affirm.
¶ 2 We restate the issues on appeal as follows:
1. Whether the District Court erred in denying Williams's post-trial motion to dismiss?
2. Whether the District Court erred in instructing the jury regarding Count III (Aggravated Assault) of the Amended Information?
3. Whether the District Court erred in ordering restitution based on the victim's testimony without written supporting documentation?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 As to the underlying facts of the offenses, the State and Williams presented dramatically different versions of events at trial. According to Williams, he drank at Bugz Bar and used methamphetamine with friends on February 28, 2014. Williams got a ride to another friend's house, but after his ride left, he discovered that his friend was not home. It was extremely cold outside and Williams decided to walk to his sister's home because she lived nearby. On his way to his sister's house, he saw K.T. (the victim) smoking in her doorway. He knew K.T. and her boyfriend. He claimed he had previously been to K.T.'s home, where she had invited him in and they used methamphetamine together and then engaged in consensual sex. Williams asserted the same occurred on the evening of February 28, 2014. After having consensual sex, K.T. inexplicably ran outside into the snow wearing only a tank top. To protect her from the freezing cold and get her to come back inside, he had to chase and tackle her.
¶ 4 The State presented a far different version of events. K.T. testified Williams broke into her home on February 28, 2014, sexually assaulted her, and held her against her will. She testified Williams strangled her, she peed her pants, and then passed out from lack of oxygen. Before losing consciousness, she believed she was going to die. When she ***287 awoke, Williams was raping her. At that time, she thought her children, who were present in the home, were likely already dead. She struggled with Williams and eventually escaped, fleeing into the cold and snow where Williams again pursued and attacked her. With her son's assistance, she escaped again, yelled for her son to "Run, run, run," and fled to a nearby neighbor's home. While K.T. was escaping from Williams, K.T.'s daughter got her baby brother, ran outside into the road, flagged down a car, and pleaded for help. Also, a cellmate of Williams after his arrest testified Williams disclosed to him several details of the crimes unknown to the public which corroborated the physical evidence at K.T.'s residence and K.T.'s testimony.
¶ 5 The jury evidently believed the State's version of events and convicted Williams of three felony offenses: SIWOC, Aggravated Burglary, and Aggravated Assault.
Williams's Post-Trial Motion to Dismiss
¶ 6 Post-trial, Williams filed a Motion to Dismiss arguing the District Court should dismiss the charges against him due to the State's failure to disclose that Steven Brester, an evidence technician with the Montana State Crime Lab (Lab) who was fired from *599 the Lab for suspicion of tampering with evidence, was involved in processing evidence at the Lab during the time the Lab processed blood and DNA evidence in Williams's case.
¶ 7 Williams asserts the Lab gave notice to the State in July 2015 regarding Brester but the State did not disclose this notice to Williams despite Williams's specific request for "[a]ll internal and external audits of the Montana State Crime Lab conducted within the last three years and all information pertaining to those audits, including but not limited to reports, findings, deficiencies, conclusions, remedies, communications, memoranda, resulting changes or directive, suggested changes and/or subsequent personnel actions."
¶ 8 The District Court heard Williams's post-trial Motion to Dismiss on May 24, 2016. Emily Wemlinger, the Lab's quality assurance manager and evidence supervisor, testified as to the Lab's process in receiving and testing items sent to it. Wemlinger testified Brester was employed as an evidence technician[1] from September 8, 2014 to June 18, 2015, at which time he was terminated due to suspicions regarding missing drug evidence. Following Brester's termination, Wemlinger and Judi Hoffman, the chemistry supervisor, inventoried the drug ***288 vault. Wemlinger did not consider this to be an "internal audit" and had no concerns about evidence stored in the other sections of the Lab.
¶ 9 Lacey Van Grinsven, the Lab serologist assigned to examine the blood/DNA evidence in Williams's case, testified she knew Brester had not opened any of the blood and DNA items in Williams's case because Brester was not employed at the Lab when it received this evidence. Van Grinsven had retrieved the blood/DNA evidence from the main vault and placed it in the DNA vault, a keyed vault, before Brester started working at the Lab. Brester did not have access to the DNA vault during his employment. After Van Grinsven completed her analysis, the stains/swabs not consumed by testing were repackaged into coin envelopes and placed into the DNA vault freezer where they have remained. The only items returned from the Lab to the Billings Police Department (BPD)-items Brester placed into shipping containers and mailed to BPD-were items not tested or analyzed.
¶ 10 Joe Pasternak, a forensic scientist at the Lab and the DNA supervisor for the State of Montana's Biology Analysis Operations, testified he received an additional order for discovery in Williams's case to provide all internal and external audits of the Lab conducted within the last three years. He indicated requests for recent audits are common as the DNA section of the Lab is audited externally every two years and internally in the years between the external audits. Pasternak supplies this audit information whenever defense counsel requests audit results. In response to Williams's discovery requests and the court's discovery order, Pasternak provided a CD containing this audit information to Williams's counsel.
Denial of Williams's motion to strike language from Count III of the Amended Information when instructing the jury
¶ 11 During settlement of jury instructions, Williams objected to inclusion of a reasonable apprehension of "death" as opposed to just apprehension of "serious bodily injury" in jury instructions 29 and 30, stating:
And, finally, with regard to Count III, there's some language in the charging document that Jessy allegedly telling [K.T.'s] children within [K.T.'s] earshot that their conduct was going to get her killed. Might appear to be an element of the offense of aggravated assault, and we would look for that to be stricken, because that's not criminal conduct, and it would be confusing to the jury and there's-we don't believe that that's an actual element of the offense.
...
The way I am looking at the elements of the Amended Information ***289 in the case is that Jessy's charged in Count III with aggravated assault, in that on the 1st of March, 2014, in Yellowstone County, Montana, he purposely or knowingly caused apprehension of death or serious bodily injury in [K.T.] by strangling her and telling her kids, "You'll get her killed," within *600 earshot of her. And the second part of the last element, telling her kids, "You'll get her killed," is not evidence of an assault, particularly an aggravated assault. In the context of the evidence that's been presented in court, it's not criminal, and it-just for clarity, it should not be a part of any instruction.
¶ 12 The District Court denied the motion, explaining,
Well, I'm-the aggravated assault instruction proposed by the State, No. 28[2] , "A person commits the offense of aggravated assault if the person purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury to another." So that's very likely to be the instruction, and probably will. So whether in the Information it says something about the children-telling the children within earshot, I don't think that affects that. I'm denying that motion. There's certainly sufficient evidence from [K.T.] about being strangled and felt that she was going to die. I think that supports the giving of the motion-or giving of the instruction on Count III. And I don't think any, you know-the language in the Information as well as telling the children within her earshot that their conduct was going to get her killed is somehow fatal to that charge. So that's denied.
¶ 13 It appears Williams's argument in his opening brief has now morphed somewhat from objection to language in Count III of the Amended Information to insufficiency of the evidence: "There was no credible testimony that Williams ever caused reasonable apprehension of death. ... [T]he only evidence presented by the State amounted to the existence of bodily harm and/or the threat of serious bodily harm, but not death."
¶ 14 Ultimately, the Court instructed the jury:
Instruction 29
Aggravated Assault A person commits the offense of aggravated assault if the person purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of ***290 serious bodily injury or death to another.
Instruction 30
Issues in Aggravated Assault To Convict the Defendant of aggravated assault, the State must prove the following elements:
1. That the Defendant, with the use of physical force or contact, caused reasonable apprehension of serious bodily injury or death to K.T.; and
2. That the Defendant acted purposely or knowingly.
District Court's Imposition of Restitution
¶ 15 At sentencing, the State did not present any documentary evidence associated with financial damages sustained by K.T. However, K.T. testified, under oath and subject to cross-examination, regarding the pecuniary loss she experienced as a result of the SIWOC, aggravated burglary, and aggravated assault. Specifically, she testified it cost $950 to replace the door of her residence, $350 to replace the locks and keys to her residence, and $400 for U-Haul and storage expenses, for losses totaling $1,700. Williams objected to imposition of restitution without written documentation of such. The District Court imposed a $1,700 restitution obligation on Williams.
STANDARD OF REVIEW
¶ 16 A motion to dismiss based on the State's failure to disclose exculpatory evidence is a question of law which we review for correctness. State v. Betterman, 2015 MT 39, ¶ 11, 378 Mont. 182, 342 P.3d 971, 136 S.Ct. 1609 (2016) ) (citation omitted). In criminal cases, we review legal determinations made when giving jury instructions to determine if, as a whole, they fully and fairly instruct the jury on the applicable law. State v. Kaarma , 2017 MT 24, ¶ 7, 386 Mont. 243, 390 P.3d 609 (citation omitted). We review the appropriateness of imposing restitution for correctness and the District Court's findings of facts regarding the amount of restitution to determine whether they are clearly erroneous. State v. Patterson , 2016 MT 289, ¶ 9, 385 Mont. 334, 384 P.3d 92 (citations *601 omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the lower court has misapprehended the effect of the evidence, or if our review of the record leaves us with the firm conviction that a mistake has been made. State v. Conley , 2018 MT 83, ¶ 9, 391 Mont. 164, 415 P.3d 473 (citation omitted).
DISCUSSION
¶ 17 1. Whether the District Court erred in denying Williams's post-trial ***291 motion to dismiss?
¶ 18 A defendant has a constitutional right of due process and the right to a fair trial. U.S. Const. amend. XIV ; Mont. Const. art. II, § 17. As such, a defendant has a constitutional right to obtain exculpatory evidence and when the State suppresses such evidence, the State violates the defendant's right to due process. Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Independent of Brady , in Montana the State has an affirmative statutory duty to disclose evidence to a defendant. See State v. Stewart , 2000 MT 379, ¶ 20, 303 Mont. 507, 16 P.3d 391. Section 46-15-322(1)(e), MCA, requires that, upon request, the State make "all material or information that tends to mitigate or negate the defendant's guilt" available to the defendant for examination and reproduction. Section 46-15-327, MCA, mandates a continuing duty of disclosure on the State as it obtains additional information. The State's duty of disclosure extends to impeachment evidence, which includes evidence tending to cast doubt on a witness's credibility. Kills on Top v. State , 273 Mont. 32, 42, 901 P.2d 1368, 1374 (1995) ; State v. Weisbarth , 2016 MT 214, ¶ 21, 384 Mont. 424, 378 P.3d 1195.
¶ 19 Williams made a specific discovery request to the State for "[a]ll internal and external audits of the Montana State Crime Lab conducted within the last three years and all information pertaining to those audits, including but not limited to reports, findings, deficiencies, conclusions, remedies, communications, memoranda, resulting changes or directive, suggested changes and/or subsequent personnel actions." The District Court granted this request and ordered disclosure and production of the discovery.
¶ 20 Williams asserts a Brady violation by the State in failing to disclose that Brester, the Lab evidence technician who was fired for suspicion of tampering with evidence, was involved in processing evidence at the Lab during the time blood and DNA evidence in Williams's case was being processed.[3] Williams asserts this information constituted material impeachment evidence without which he could not impeach the forensic scientific testing or attack the chain of custody.
¶ 21 To establish a Brady violation, Williams must establish the following elements: 1) the State possessed evidence, including impeachment evidence, favorable to the defense; 2) the prosecution suppressed the favorable evidence; and 3) had the evidence been ***292 disclosed, a reasonable probability exists the outcome of the proceedings would have been different. Weisbarth , ¶ 20.
¶ 22 The State does not really contest Williams established element 1. The State clearly possessed the information regarding Brester and did not disclose it to Williams. The State sort of contests Williams's establishment of element 2, contending Wemlinger's and Hoffman's inventory of the drug vault in response to Wemlinger's suspicion of missing drug evidence and Brester's subsequent termination and referral for prosecution was not considered an "internal audit." The State further contends Pasternak, the forensic scientist charged with providing the discovery ordered by the court, assumed the audit material sought was that of the external audit of the Lab's DNA section occurring every two years and the intervening internal audit in the years between the external audits. Given the specificity of Williams's discovery request, the State is disingenuous to fail to provide Wemlinger's and Hoffman's information and findings to Williams under the guise this did not constitute an "internal *602 audit." This semantic gamesmanship does little to engender trust in the State. It is incumbent on the State's counsel to assure the production of complete and correct information responsive to a defendant's discovery request or a court's discovery order. Complete reliance without review and oversight on the Lab personnel to satisfy discovery requests and orders is insufficient to meet the State's obligations of disclosure. Thus, Williams sufficiently established element 2.
¶ 23 The State asserts Williams cannot establish the third element necessary to a Brady violation-a reasonable probability the outcome of the proceedings would have been different. With regard to element 3, Williams asserts that any attack on the credibility of evidence could have assisted him at trial, and without the undisclosed evidence he had no way of attacking the forensic analysis or chain of custody. This assertion is not persuasive in light of the timeframe of the Lab's blood/DNA testing and analysis, the timeframe of Brester's employment at the Lab, and the defense Williams presented at trial. The Lab received the blood/DNA evidence regarding Williams's case prior to the start of Brester's employment. Van Grinsven, the Lab analyst who tested the blood/DNA submitted to the Lab, retrieved the blood/DNA evidence from the main vault and placed it in the DNA vault, a keyed vault, before Brester started working at the Lab. Brester did not have access to the DNA vault during his employment at the Lab. After Van Grinsven completed her analysis, the stains/swabs not consumed by testing were repackaged into coin envelopes and placed into the DNA vault freezer where they have remained. The only items ***293 returned from the Lab to BPD-items Brester placed into shipping containers and mailed to BPD-were items not tested or analyzed. Given Brester's complete lack of access to and involvement with the tested evidence, no reasonable probability exists that the outcome of the proceedings would have been different had the State disclosed the information it possessed regarding Brester. Further, at trial, Williams did not deny sexual contact with K.T., but rather asserted the contact was consensual. This defense was consistent with the blood/DNA analysis presented by the State.
¶ 24 Upon recognizing the incongruity of this argument and his presented defense, Williams alternately argues had he "been aware of the Brester information prior to trial, his defense strategy might have played out differently" and "may have influenced and played a significant role in Williams' decision to testify during trial and argue the defense of consent." Like the State's argument regarding element 2, given the overwhelming evidence presented by the State, Williams's argument in this regard is disingenuous. Also, given the timing of Brester's hiring and firing, the serology and DNA testing occurring before Brester was hired, and Brester's lack of access to the keyed DNA vault where the unconsumed specimens remain, it is a tenuous leap to conclude the Brester information would have meaningfully assisted Williams in impeaching the serology and DNA evidence or the chain of custody. Even without the Brester information, Williams could have obtained his own expert to attempt to impeach the serology and DNA test results and could have made tactical decisions regarding what defense to assert in conjunction with his own expert's analysis. We therefore conclude the District Court was correct in finding Williams did not establish element 3 and did not err in denying Williams's Motion to Dismiss based on an asserted Brady violation.
¶ 25 Williams next argues that reversal of his convictions is justified pursuant to § 46-15-329, MCA, as a sanction for the State's failure to disclose the Brester information. Williams asserts Wemlinger conceded that during the time period of the criminal case against Brester, Brester's offenses affected more than only drug cases and therefore the State "has now admitted that Brester's actions may have affected all evidence at the Lab during his tenure." This assertion misconstrues Wemlinger's testimony. Although she conceded Brester's conduct affected more than drug cases, she did not testify his offenses affected all evidence at the Lab. It is clear from the testimony of Wemlinger, Van Grinsven, and Pasternak that Brester had no contact or involvement with the receipt, handling, storage, testing, or analysis of the blood/DNA samples in Williams's case.
*603 While we are nonplused ***294 with the State's level of diligence in review and oversight of its responses to the discovery request and order in this case, we cannot conclude under these circumstances the District Court erred in denying William's Motion to Dismiss.
¶ 26 2. Whether the District Court erred in instructing the jury regarding Count III (Aggravated Assault) of the Amended Information?
¶ 27 With regard to Count III, Aggravated Assault, the District Court instructed the jury as follows:
Instruction 29
Aggravated Assault A person commits the offense of aggravated assault if the person purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death to another.
Instruction 30
Issues in Aggravated Assault To Convict the Defendant of aggravated assault, the State must prove the following elements:
1. That the Defendant, with the use of physical force or contact, caused reasonable apprehension of serious bodily injury or death to K.T.; and
2. That the Defendant acted purposely or knowingly.
¶ 28 During settlement of jury instructions, Williams rather inarticulately attempted to object to inclusion of reasonable apprehension of "death" into Instructions 29 and 30 by referencing the language contained in Count III of the Amended Information. On appeal, this objection has more articulately morphed into an objection that the State presented insufficient evidence that Williams caused K.T. reasonable apprehension of death to support instruction regarding reasonable apprehension of death. Williams asserts that, based on the State's evidentiary presentation, it was error for the District Court to include reference to "death" such that Instructions 29 and 30 should only have instructed on "reasonable apprehension of serious bodily injury." The State asserts Williams did not preserve this issue for appeal and fails to meet his burden in establishing the appropriateness of plain-error review. While Williams's counsel could have more articulately objected regarding this issue, we find he sufficiently preserved the issue. From review of the record, we also conclude Williams's assertion of insufficiency of the evidence regarding reasonable apprehension of death is not persuasive.
¶ 29 The State presented evidence from K.T. as to Williams's assaultive conduct on February 28, 2014. K.T. specifically testified to Williams breaking into her home, strangling her, sexually and physically assaulting her, her loss of consciousness, and her belief she ***295 was going to die. K.T.'s son testified to his fear for his mother and to resorting to using a knife to try to protect K.T. from further violence by Williams. There was clearly sufficient evidence to present the issue of whether Williams caused K.T. reasonable apprehension of death to the jury. Instructions 29 and 30 fully and fairly instructed the jury on the offense of aggravated assault consistent with the evidence presented at trial. As such, we conclude the District Court did not err in instructing the jury regarding Count III (Aggravated Assault) of the Amended Information.
¶ 30 3. Whether the District Court erred in ordering restitution based on the victim's testimony without written supporting documentation?
¶ 31 Section 46-18-201(5), MCA, requires, in addition to any other penalties, the sentencing judge impose restitution for pecuniary loss sustained by the victim on a defendant convicted of a criminal offense. Williams asserts the District Court erred in imposing the $1,700 restitution obligation testified to by K.T. on Williams without requiring documentation supporting the expenses. The State counters that a court may award restitution relying on a victim's testimony where the defendant had a due process right to explain or rebut the claimed loss but fails to present any contradictory evidence. See State v. Simpson , 2014 MT 175, ¶ 14, 375 Mont. 393, 328 P.3d 1144 (citations omitted).
¶ 32 Here, the District Court heard the testimony, reviewed the documentary evidence presented at trial, and considered *604 K.T.'s testimony at the sentencing hearing. At the sentencing hearing, Williams had full opportunity to cross-examine K.T. and to present evidence rebutting her testimony. Further, the expenses she testified to were not so far out of the realm of common experience to lead to an inherent disbelief of K.T.'s testimony regarding these expenses. Nothing in Montana's restitution statutes requires written supporting documentation[4] or precludes a court from ordering restitution based on the victim's testimony. Therefore, we conclude the restitution amount imposed by the District Court was not clearly erroneous and its legal conclusion requiring Williams pay K.T. restitution was correct.
CONCLUSION
¶ 33 We conclude the District Court did not err in denying Williams's Motion to Dismiss based on either a Brady violation or as a discovery sanction. Given the evidence presented during trial, the District Court ***296 fully and fairly instructed the jury as to the offense of aggravated assault. Finally, the District Court did not err in imposing restitution based on K.T.'s testimony as Williams had full opportunity to cross-examine K.T. and to present evidence rebutting her testimony. Further, the expenses she testified to were not so far out of the realm of common experience to lead to an inherent disbelief of K.T.'s testimony regarding these expenses.
¶ 34 Affirmed.
We concur:
LAURIE McKINNON, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.
DIRK M. SANDEFUR, J.

According to Wemlinger, evidence technicians never analyze any piece of evidence at the Lab.

The proposed instruction referenced by the District Court was Instruction 29, not 28.

Brester later pled guilty to offenses involving tampering with public records and drug possession.

However, providing written documentation substantiating the restitution calculation is a better practice than merely presenting a victim's testimony.