

FILED

08/03/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0608

DA 19-0608

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 193

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

BARAK JAMES MCGHEE,

        Defendant and Appellant.

FILED

AUG 0 3 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Richland, Cause No. DC-18-125
Honorable Katherine M. Bidegaray, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Megan M. Moore, Watson Law Office, PC, Bozeman, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

        Janet Christoffersen, Richland County Attorney, Charity McLarty, Deputy
County Attorney, Sidney, Montana

Submitted on Briefs:  April 7, 2021

Decided:  August 3, 2021

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Barak James McGhee appeals his 2019 judgment of conviction and sentence in the Montana Thirteenth Judicial District Court, Richland County, on the offense of Indecent Exposure to a Minor, a felony in violation of § 45-5-504(3), MCA. We address the following restated issues:

1. *Whether the District Court erroneously allowed cross-examination of McGhee about a prior allegation of sexual misconduct toward his daughters to rebut his assertion that he previously had an "awesome" relationship with them?*

2. *Whether the District Court erroneously imposed an unduly harsh sentence?*

We affirm.

## FACTUAL AND PROCEDURAL BACKROUND

¶2 On November 21, 2018, the State charged McGhee by Information with two counts of Indecent Exposure to a Minor, based on an allegation that he exposed his penis to his nine-year-old twin daughters. The allegation arose in the context of the ongoing strained relationship between McGhee and the girls' mother (Mother) following their breakup in 2012. The breakup resulted in a court-ordered parenting plan which gave McGhee custody of the girls on alternating weekends. In 2018, Mother alleged to police that, on or about September 7, 2018, the twins told her that, during their last weekend stay with McGhee, he pulled his pants down and showed them his "private parts" in their bedroom at his home in Sidney, Montana. The revelation allegedly occurred in the context of her styling the girls' hair for school photos and discussing their upcoming weekend stay with McGhee. In subsequent forensic interviews conducted by a child protection specialist, the girls told the

2

interviewer, consistent with Mother's initial report, that he dropped his pants and showed them his "naughty parts" in response to a question from one of them about "how babies were made."

¶3 At the final pretrial status hearing on May 13, 2019, McGhee objected to a reference on the State's trial exhibits list to investigatory materials obtained from North Dakota law enforcement authorities regarding a 2015 allegation by Mother that he exposed his penis to the girls, put a candy sucker on it, and had them lick the sucker. Mother further alleged that he also placed a sucker on or near the vagina of one of the girls and then licked the vaginas of both girls. McGhee denied the allegations and the ensuing investigation resulted in no criminal charges. During the pendency of the investigation, however, Mother obtained a temporary civil court order suspending his access to the girls under the parenting plan. The order remained in effect for almost two years, apparently due to his inability to get confirmation of the close of the investigation. In July 2017, following court-ordered reunification therapy, the North Dakota court reinstated his parenting rights under the prior parenting plan.

¶4 Based on McGhee's pretrial objection in this case, the court ordered simultaneous pretrial briefing on the admissibility of the 2015 North Dakota allegations in regard to the subject offenses. The resulting briefing focused on whether the prior North Dakota allegations would be properly admissible at trial under M. R. Evid. 404(b) for a legitimate non-propensity purpose. Pursuant to *State v. Madplume*, 2017 MT 40, 386 Mont. 368, 390 P.3d 142, the State asserted that the prior bad acts evidence would be admissible as

evidence that McGhee committed the subsequently charged offenses in accordance with a common plan, motive, or intent. He countered that *Madplume* was distinguishable and that the North Dakota allegations were otherwise insufficient under M. R. Evid. 404(b) for the State's asserted purpose. On the morning of trial, and in the wake of the State's objection to a suggested continuance to allow McGhee adequate time to review and address the particulars in the North Dakota materials,[1] the District Court sustained his earlier objection and barred the State from introducing or referencing the North Dakota allegations without prior leave of court.

¶5 At trial, after presentation of the State's case-in-chief, McGhee presented the testimony of his two brothers and long-time girlfriend who described his relationship with the girls as "wonderful," "excellent," or "great." His girlfriend further testified that, during their six-year relationship, she never saw the girls fearful of McGhee or saw anything "inappropriate." One of his brothers similarly testified that, "[a]ll I ever saw was him being a good dad."

¶6 McGhee then testified on his own behalf. When asked by counsel to "describe [his] relationship with [the] girls," he answered:

> [B]efore all this, *absolutely awesome.* . . . I adore them, they . . . adore me.
> . . . [T]hey're always wanting to do stuff and they're always asking me, . . .
> how to do some cool stuff . . . [a]nd . . . I'd like to think that we have a good
> relationship.

---

[1] For reasons unclear on the record, McGhee and his counsel had apparently not yet had the opportunity to review some or all of the North Dakota investigative materials obtained by the State regarding the prior allegations.

[Counsel]:    Did they ever express any desire to not be around you?

[McGhee]:    No, actually, quite the opposite. They would express regular[ly] that they wished they could live with me and they would say . . . they love to [go] back to their mom [because] they love their little brothers . . . but, they multiple times stated that they wanted to live with me.

[Counsel]:    Did you have any reason to believe that they didn't want to be around you?

[McGhee]:    No, not at all.

(Emphasis added.)

¶7    At a sidebar following McGhee's direct testimony, the State asked the court to reconsider its earlier ruling barring reference to the prior North Dakota allegations. The prosecutor asserted that, in light of McGhee's testimony that he had an "awesome" relationship with the girls, the State:

is basically hamstrung, at this point, without bringing in prior bad acts[.] . . . [W]e can't really refute the fact without bring[ing in] . . . that the relationship has not always been a good relationship[,] as he's trying to show the jury[.] So, . . . the State is not able to counter without using . . . some of those [prior allegations]. So, we are asking for leniency in cross . . . [to] ask him those questions.

Through counsel, McGhee objected on relevance grounds, to wit:

Judge, we did not open the door for 404(b). The State also asked questions about the girls' relationship and how they missed their dad and I was very careful . . . , I tried to tailor my questions with regard to describing things that happened this last summer. I did not ask him 'have you been accused of anything else.' . . . I tried to tailor it with regard to, specifically, this last summer. . . . [I]f he said I've always ha[d] a good relationship with them, I do not believe that opens the door to a whole can of worms of allegations from another jurisdiction which, again, I still have not had the opportunity to

5

ferret out. I think . . . simply saying he's had a good relationship with his daughters does not open that door. Everyone . . . has indicated that the girls love their dad and that they miss their dad. That, in and of itself, is – we're all trying to play within the perimeters of avoiding talking about some other alleged act.

¶8 The District Court concluded, however, that McGhee's response to the defense questioning about the nature of his relationship with his girls was sufficiently "broad" to "open[] up the door" by making the prior allegations relevant to refute his broad characterization of the relationship. After the court granted the State "some latitude," the following colloquy ensued on cross-examination when trial resumed the next day:

| [State]: | . . . [Y]ou testified that you have an awesome . . . relationship with your daughters. Is that correct? |
|---|---|
| [McGhee]: | Yes. |
| [State]: | [But] is it not true that there came a point when you didn't have any relationship with your daughters at all? |
| [McGhee]: | Yes. |
| [State]: | . . . How long did you did you have to go without seeing your daughters? |
| [McGhee]: | It was about two years. |
| [State]: | And why was that? |
| [McGhee]: | Because . . . there was an allegation made in the past. |
| [State]: | . . . Was it made by your daughters? |
| [McGhee]: | . . . [I]t was made by [their mother] originally and then, yes, the girls were involved. |
| [State]: | . . . How old were the girls at that time? |

6

[McGhee]:      Four or five.

[State]:       And so, . . . you said it was two years you didn't see them?

[McGhee]:      Yes.

      .  .  .

[State]:       So, why was it two years . . . ?

[McGhee]:      . . . [W]hen the original allegation was started, [Mother] started by calling the local police . . . and the Justice of the Peace . . . suggested . . . a restraining order until they got things actually moving with the case . . . .

      .  .  .

[State]:       But you're saying the case was closed and they still wouldn't tell you?

[McGhee]:      They didn't tell me, no.

      .  .  .

[State]:       . . . So, the girls were about . . . four or five when th[e] [prior] alleged event happened, right?

[McGhee]:      Yes.

      .  .  .

[State]:       . . . [Since] you started having contact with your girls again, are you able to have them overnights?  What was the set up?

[McGhee]:      I started having them overnight right away. . . . I'd had them overnight for well over a year before [the 2018] allegations came up.

      .  .  .

[State]:       . . . [Y]esterday [your current girlfriend] testified that you guys had been together six years?

7

[McGhee]:     [Yes].

                              .   .   .

[State]:      So, . . . she's aware of [the North Dakota allegations]?

[McGhee]:     Yes[,] . . . absolutely, she's aware of the events.

                              .   .   .

[State]:      . . . [I]sn't it true that yesterday . . . you sat and listened to testimony where both of your daughters said that [one of them] told [their mother] that you dropped your pants in front of them?

[McGhee]:     Yes, I heard that.

                              .   .   .

[State]:      So, did they get up yesterday and lie[?]

[McGhee]:     Yes.

[State]:      Why?

[McGhee]:     Because they were told to and coerced. Years of being told that I'm a bad person and all crap that's not true . . . children are malleable. They're like clay. . . .

[State]:      And it has nothing to do that you've been accused of this kind of behavior before and you might have done this to these girls?

[McGhee]:     Absolutely not.

[State]:      So, basically it's everyone's fault but yours?

[McGhee]:     No, . . . [the] relationship ended not amicably and [their mother] has had animosity and hatred toward me ever since. And I do not know why, it's never been explained in a real way. I know I didn't make her happy, but that's all I really know.

8

. . .

[State]:      . . . [H]ave there not been massive issues between you legally with her in the past?

[McGhee]:     No, I don't understand . . . what you're trying to insinuate.

[State]:      This isn't the first time you've been accused of doing something inappropriate with your daughters, correct?

[McGhee]:     . . . No, this is . . . not the first time.

[State]:      So, that couldn't be a reason that . . . maybe you guys have problems?

[McGhee]:     No[,] that has been way before any allegation was ever made. The allegations are her way of a means to an end.

[State]:      . . . So, what is the end?

[McGhee]:     The end is her having full custody and me not being in the picture at all.

On redirect, McGhee's counsel followed up on the North Dakota allegations, to wit:

[Counsel]:    . . . [Y]ou were asked a question about the prior allegations . . . from North Dakota, correct?

[McGhee]:     Yes.

. . .

[Counsel]:    And . . . those allegations were investigated but there were no charges ever stemming from that, correct?

[McGhee]:     Yes.

. . .

9

[Counsel]: And you were asked about why [Mother] would not . . . care much about you, . . . [that she] ha[d] issues with you long before . . . either allegations were made, correct?

[McGhee]: Yes.

¶9 *Inter alia*, the court's instructions of law given to the jury prior to closing arguments included the following limiting instruction (Instruction No. 11):

> The State has offered evidence that the Defendant at another time engaged in other crimes, wrongs, or acts. *That evidence was not admitted to prove the character of the Defendant or to show he acted in conformity therewith. . . .*[2] The Defendant is not being tried for that other crime, wrong, or act. He may not be convicted for any other offense than that charged in this case. For the jury to convict the Defendant of any other offense than that charged in this case may result in unjust double punishment of the Defendant.

(Emphasis added.) After deliberation, the jury returned a verdict finding McGhee guilty of indecent exposure regarding one of the daughters, but not guilty as to the other. Upon consideration of the mandatory presentence investigation report, the included psychosexual evaluation, and the balance of the sentencing hearing record, the District Court sentenced him to a 50-year prison term, with 42 years suspended, but restricted parole eligibility until after the subject daughter turns 18 years old and his completion of prison-provided sex offender treatment (Phases I and II). McGhee timely appeals.

---

[2] However, contrary to the earlier-stated purpose for allowing the State to cross-examine McGhee about the prior North Dakota allegations, the limiting instruction further inconsistently instructed that "[t]he only purpose of admitting that evidence *was to show proof of motive, opportunity, plan, knowledge, identity, absence of mistake or accident*. You may not use that evidence for any other purpose." (Emphasis added.) In its ensuing closing argument, the State repeated that inconsistent statement of purpose.

## STANDARD OF REVIEW

¶10 District courts have broad discretion to determine the admissibility of evidence in accordance with the Montana Rules of Evidence and related statutory and jurisprudential rules. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811; *State v. Parker*, 2007 MT 243, ¶ 9, 339 Mont. 211, 169 P.3d 380; *State v. Strauss*, 2003 MT 195, ¶ 18, 317 Mont. 1, 74 P.3d 1052. Except for related interpretations or applications of law which we review de novo for correctness, we generally review evidentiary rulings for an abuse of discretion. *Derbyshire*, ¶ 19; *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229. An abuse of discretion occurs if a court exercises granted discretion based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *State v. Pelletier*, 2020 MT 249, ¶ 12, 401 Mont. 454, 473 P.3d 991 (internal citations omitted); *Derbyshire*, ¶ 19.

¶11 Criminal sentences eligible for statutory sentence review are reviewable on appeal only for legality, *i.e.*, whether the court sentenced the defendant in accordance with governing statutory and constitutional parameters and requirements. *State v. Herman*, 2008 MT 187, ¶ 11, 343 Mont. 494, 188 P.3d 978; *State v. Ariegwe*, 2007 MT 204, ¶ 174, 338 Mont. 442, 167 P.3d 815; *State v. Hicks*, 2006 MT 71, ¶ 41, 331 Mont. 471, 133 P.3d 206; *State v. Herd*, 2004 MT 85, ¶ 22, 320 Mont. 490, 87 P.3d 1017; *State v. Montoya*,

11

1999 MT 180, ¶ 15, 295 Mont. 288, 983 P.2d 937.[3] Whether a court imposed a legal sentence or sentencing condition is a question of law reviewed de novo. *State v. Seals*, 2007 MT 71, ¶ 7, 336 Mont. 416, 156 P.3d 15; *State v. Bull*, 2017 MT 247, ¶ 9, 389 Mont. 56, 403 P.3d 670.

## DISCUSSION

¶12    1. *Whether the District Court erroneously allowed cross-examination of McGhee about a prior allegation of sexual misconduct toward his daughters to rebut his assertion that he previously had an "awesome" relationship with them?*

¶13    McGhee acknowledges that M. R. Evid. 404(b) does not preclude admission of other acts evidence for relevant purposes other than as propensity evidence and that a defendant may "open the door" to admission of otherwise inadmissible other acts evidence through assertions or suggestions in opening statements or elicited witness testimony. He asserts, however, that his broad statement that he previously had an "awesome" relationship with his daughters was not sufficiently specific to "open the door" to cross-examination regarding the prior North Dakota allegations in this case. He thus asserts that the District Court erroneously reversed its prior exclusionary ruling. The State asserts that the District Court correctly allowed limited cross-examination of McGhee regarding the North Dakota allegations for permissible non-propensity impeachment or rebuttal purposes. We ultimately agree with the State.

---

[3] Sentence review generally applies only to unsuspended state prison terms, and unsuspended commitments to the Montana Department of Corrections for appropriate correctional placement, for "1 year or more." *See* § 46-18-903(1), MCA; *Herd*, ¶¶ 19-23.

12

(A) *Rule 404(b) Other Acts Evidence.*

¶14 "Evidence of other crimes, wrongs, or acts" is generally not admissible for the purpose of "prov[ing] the character of a person in order to show action in conformity therewith." M. R. Evid. 404(b). The purpose of this general rule is to preclude an impermissible jury inference, based on evidence of other uncharged bad acts or allegations, that an accused is a person of bad character, and thus likely guilty of the charged offense based on common experience or belief that persons of bad character are predisposed or have a tendency or propensity to subsequently act in conformance therewith. *See* M. R. Evid. 404(b); *Madplume*, ¶ 22 (internal citations omitted); *State v. Stewart*, 2012 MT 317, ¶¶ 61-62, 367 Mont. 503, 291 P.3d 1187; *State v. Mont. Eighteenth Jud. Dist. Ct. (Salvagni)*, 2010 MT 263, ¶¶ 47 and 62; 358 Mont. 325, 246 P.3d 415 (internal citations omitted); *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648 (Rule 404(b) purpose "is to prevent convictions that are merely based on a jury finding that [an accused] has a propensity to do certain things"). The general rule of M. R. Evid. 404(b) thus bars admission of or reference to other acts for the purpose of supporting an inference of guilt based on conformance with prior bad character.

¶15 Rule 404(b) nonetheless expressly authorizes admission of other acts evidence when relevant "for other purposes." M. R. Evid. 404(b) (referencing non-exclusive list of other potentially relevant non-propensity purposes). Rule 404(b) is a particular "application of the doctrine of multiple admissibility" under which evidence inadmissible for one purpose may yet be admissible for another relevant purpose. *Pelletier*, ¶ 18 (citing 22B Charles

13

Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 5243, 132 (West 2017)). Read as a whole and contrary to "frequent misconception," Rule 404(b) does not categorically bar all other acts evidence, but only a particular *"theory of admissibility"* of such evidence. *Salvagni*, ¶ 47 (emphasis original). The alternative or exception clause of Rule 404(b) is "a contrasting rule of inclusion" for admission of other acts evidence that has independent relevance to a material matter at issue other than for proof of propensity conformance. *See Pelletier*, ¶ 18 (citing *Salvagni*, ¶ 47 and *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007)); *Salvagni*, ¶¶ 47 and 62. Under Rule 404(b), the distinction between admissible and inadmissible other acts evidence thus depends on the particular purpose or effect of the evidence. *Madplume*, ¶ 23 (citing *Salvagni*, ¶¶ 47 and 62-63); *Stewart*, ¶¶ 61-62; *Salvagni*, ¶ 62.

¶16 Even when properly admissible for a non-propensity purpose, other acts evidence carries an inherent risk of prejudice due to the potential that the finder of fact will nonetheless infer that the accused is guilty based on propensity for conformance with prior bad character. *See State v. Brubaker*, 191 Mont. 481, 484, 625 P.2d 78, 79-80 (1981); *State v. Just*, 184 Mont. 262, 268, 602 P.2d 957, 960-61 (1979), *overruled on other grounds by Salvagni*, ¶ 3; *State v. Tiedemann,* 139 Mont. 237, 242-43, 362 P.2d 529, 531 (1961). The risk is ameliorated, or at least fairly mitigated, upon careful balancing of relevance and limiting factors under M. R. Evid. 401-03, and appropriate cautionary or limiting instruction under § 46-16-401(1), MCA, and M. R. Evid. 105. *See State v. Blaz*, 2017 MT 164, ¶ 20, 388 Mont. 105, 398 P.3d 247; *Salvagni*, ¶ 62.

14

(B) *Evidence Bearing on Witness Credibility.*

¶17 "All relevant evidence is admissible" except as otherwise provided by the Rules of Evidence and related statutory and jurisprudential rules. M. R. Evid. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact . . . of consequence to the determination of the action more . . . or less probable." M. R. Evid. 401. "Relevant evidence may include," *inter alia*, "evidence bearing [on] the credibility of a witness." M. R. Evid. 401. Credibility is "[t]he quality that makes [witness testimony or other evidence] worthy of belief." CREDIBILITY, *Black's Law Dictionary* (11th ed. 2019). "Impeachment evidence is 'evidence tending to cast doubt' on the credibility of a witness" or witness testimony. *Pelletier*, ¶ 14 (citing *State v. Williams*, 2018 MT 194, ¶ 18, 392 Mont. 285, 423 P.3d 596).

(C) *Rule 607(a) Impeachment by Contradiction via Other Acts Evidence.*

¶18 A party may challenge or attack the credibility of any witness. M. R. Evid. 607(a); *State v. Zimmerman*, 2018 MT 94, ¶ 23, 391 Mont. 210, 417 P.3d 289 (also citing Rule 401). *See also* § 26-1-302, MCA (presumption that a witness speaks the truth "may be controverted and overcome by any matter that has a tendency to disprove the truthfulness of [the] witness's testimony"); *Pelletier*, ¶ 32 (distinguishing Rule 607(a) authorization from application of M. R. Evid. 404(a)(1) and 608(b)). Among the various means of attacking or impeaching witness credibility preserved thereunder, Rule 607(a) encompasses and authorizes evidence of impeachment by contradiction. *Passmore*, ¶¶ 59-63 (discussing non-character-based impeachment by contradiction); *In re Seizure of*

15

*$23,691.00 in U.S. Currency*, 273 Mont. 474, 480-82, 905 P.2d 148, 152-53 (1995) (distinguishing Rule 608(b) impeachment of character for truthfulness from non-character-based impeachment of credibility); *State v. Gommenginger*, 242 Mont. 265, 272, 790 P.2d 455, 459-60 (1990) (noting that extrinsic evidence of bias/motive to testify falsely was pertinent to a witness's credibility for truthfulness but not subject to the extrinsic evidence bar of Rule 608 because offered as impeachment evidence directly probative of guilt rather than as propensity evidence regarding witness's character for untruthfulness); *State v. Hayes*, 462 P.3d 1110, 1117-20 (Idaho 2020) (distinguishing Rule 608(b) cross-examination impeachment of character for untruthfulness and extrinsic evidence bar from non-character-based witness impeachment via extrinsic evidence of contradictory facts, bias, or undue influence); 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6118, 113-14 (2d ed. 2019) (distinguishing permissible Rule 608(b) cross-examination in re witness character for truthfulness from Rule 607 impeachment evidence rebutting/contradicting truth or accuracy of witness testimony); Commission Comments to M. R. Evid. 607 (1976) (noting "traditional methods of impeachment . . . preserved by this rule").[4]

¶19 Impeachment by contradiction is attacking "the credibility of a witness" by cross-examination or extrinsic evidence offered "to prove that a fact which the witness

---

[4] *See also* § 26-1-302(9), MCA (presumption that a witness speaks the truth "may be controverted and overcome by any matter that has a tendency to disprove the truthfulness of [the] witness's testimony," including "evidence contradicting the witness's testimony," *inter alia*).

16

asserted or relied upon in [his or her] testimony is not true." *Passmore*, ¶ 59. Evidence of impeachment by contradiction has two related but distinct purposes—first, as a basis for an "inference that the witness either lied or was mistaken with respect to the specific fact contradicted," and second, as a basis for an inference that the witness is thus a generally "unreliable source of information" and therefore similarly mistaken, dishonest, or unreliable as to the balance of his or her testimony. *Passmore*, ¶ 59. While impeachment by contradiction may relate either to a matter that is directly at issue or only ancillary or collateral thereto, admission is in either event subject to balancing under the relevance and limiting factors of M. R. Evid. 401-03. *Passmore*, ¶¶ 60-61 (recognizing Rule 403 displacement of "too mechanistic" common law "collateral-fact rule"). Thus, when relevant and admissible for non-propensity impeachment purposes under M. R. Evid. 401-03 and 607(a), evidence of impeachment by contradiction is admissible via cross-examination or extrinsic evidence regarding other acts regardless of the general rule of Rule 404(b). *See* M. R. Evid. 404(b) ("other acts" alternative/exception); *Pelletier*, ¶ 32 (citations omitted); *State v. Polak*, 2018 MT 174, ¶¶ 21-23, 392 Mont. 90, 422 P.3d 112; *Passmore*, ¶¶ 60-61.[5]

---

[5] In contrast to evidence of impeachment by contradiction, evidence of general contradiction is evidence offered for the non-impeachment purpose of either directly contradicting previously admitted testimony or evidence, or indirectly challenging or undermining its veracity. *United States v. Williamson*, 424 F.2d 353, 355 (5th Cir. 1970) (distinguishing impeachment evidence and general contradictory evidence). *Accord United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1263 (7th Cir. 1975) ("[i]mpeachment is an attack upon the credibility of a witness" but "[a] witness'[s] testimony may be contradicted without being impeached"—citing *Williamson*). Often used in tandem with the related term "credibility," "veracity" means "[c]onsistency with the truth[,] accuracy." VERACITY, *Black's Law Dictionary* (11th ed. 2019).

(D) *Rule 404(a) Good Character Impeachment/Rebuttal by Other Acts Evidence.*

¶20  Distinct from Rule 607(a) evidence of impeachment by contradiction, and regardless of the general rule of M. R. Evid. 404(b), M. R. Evid. 404(a)(1) specifically authorizes admission via cross-examination or extrinsic evidence of otherwise inadmissible other acts evidence when relevant to rebut defense evidence that the accused has a pertinent good character trait inconsistent with the alleged offense, and which is usually elicited "for the purpose of supporting an inference that he or she is not guilty." *Pelletier*, ¶¶ 16 and 19 (citations omitted).  Accordingly, defense presentation or elicitation of good character evidence ("*e.g.*, that he or she is honest, trustworthy, has moral integrity, or is a peaceful, non-violent, loving, caring, or law-abiding person," etc.) may, in the discretion of the court, "open the door" to cross-examination or extrinsic evidence regarding other prior bad acts to the contrary.  *Pelletier*, ¶¶ 16 and 19 (citations omitted).

(E)  *Other Acts Explaining/Correcting a False Impression or Rebutting an Attack on Another Witness's Testimony.*

¶21  Distinct from evidence of impeachment by contradiction and good character rebuttal evidence under M. R. Evid. 607(a) and 404(a)(1), a defendant may, by opening statement or elicited witness testimony, further "open the door" to cross-examination or extrinsic evidence regarding otherwise inadmissible other acts evidence which then becomes relevant for the purpose of explaining or correcting a pertinent false impression or assertion, or rebutting an attack on the credibility of another witness.  *See Polak*, ¶¶ 21-23; *State v. Guill*, 2010 MT 69, ¶ 39, 355 Mont. 490, 228 P.3d 1152 (internal citations omitted); *State v. Cesnik*, 2005 MT 257, ¶¶ 15-17, 329 Mont. 63, 122 P.3d 456; *State v. Weitzel*,

18

2000 MT 86, ¶ 35, 299 Mont. 192, 998 P.2d 1154; *State v. Veis*, 1998 MT 162, ¶ 18, 289 Mont. 450, 962 P.2d 1153.

¶22 In *Guill*, the district court ruled in limine that various uncharged incidents of violence and abusive conduct by the defendant against his ex-wife and other family members would be admissible pursuant to § 26-1-103, MCA (transaction rule), and the Rule 404(b) exception for proof of common plan or scheme, as proof that he subjected his daughter to sexual intercourse without consent (SIWC) over a period of years as charged. *Guill*, ¶¶ 3-10. The affirmative ruling was limited, however, to prior incidents of which the victim-daughter was aware, except to the extent that the defendant might subsequently "open the door," upon cross-examination of a State witness, to a broader scope of prior incidents of violence against other family members. *Guill*, ¶ 8. In his opening statement at trial, the defendant, through counsel, categorically denied committing the charged offense and further suggested that his daughter and ex-wife fabricated the SIWC allegation as a means to get money and property he intended to bequeath to his girlfriend. *Guill*, ¶ 9. During the State's case-in-chief, the district court accordingly allowed the ex-wife to testify beyond the limited ruling in limine regarding an incident, of which the victim was not aware, wherein the defendant "choked [the ex-wife] when she had tried to assert herself against him." *Guill*, ¶¶ 10 and 38. In affirming on appeal, we held that, by challenging the ex-wife's "credibility or bias" in his opening statement, the defendant "opened the door to," *i.e.*, made relevant, the previously excluded choking incident to "correct" or rebut the

19

"impression that [she] was an aggressive, calculating woman, intent on acquiring [his] wealth." *Guill*, ¶ 40.

¶23 In *State v. Clemans*, 2018 MT 187, 392 Mont. 214, 422 P.3d 1210, the wife of a defendant charged with sexually assaulting his 16-year-old stepdaughter testified on direct examination that, based on the defendant's prior acts of violence toward family members, the victim-daughter feared him and pleaded with the wife to not confront him regarding the alleged sexual assault. *Clemans*, ¶¶ 7 and 12. On cross-examination, defense counsel challenged the wife's statement that the daughter feared the defendant, and thus the truth of her testimony and the daughter's central allegation, by asking why they returned and stayed in the home if the daughter was so afraid of him. *Clemans*, ¶¶ 12 and 15. The wife reaffirmed her earlier testimony regarding the daughter's fear, but cryptically stated it was necessary for "our safety" to return home and ensure that "everything" appeared to "still [be] normal" "so we could leave [when] it was safe for us to leave." *Clemans*, ¶ 12. On redirect, the court then allowed the State, over objection and subject to limiting instruction, to elicit additional testimony from the wife that the defendant had also earlier assaulted her son, who then left the home, and that she and her daughter returned home after revelation of the alleged assault in order "to put a plan together to leave safely." *Clemans*, ¶¶ 13-14. In affirming on appeal, we reasoned that by suggesting on cross-examination of the wife that her daughter was in fact not afraid of the defendant, and that the wife thus believed it was safe for them to return home, the defendant was attempting "to cast doubt on the veracity of [the daughter's] allegation" that he sexually assaulted her. *Clemans*, ¶ 15. We

20

held that the defendant thereby "opened the door" to the otherwise inadmissible other acts evidence to explain the circumstances and correct the false impression that he was trying to create as to why the wife did not immediately protect her daughter by keeping her out of the home. *Clemans*, ¶ 15.

(F) *Relevance of North Dakota Allegations for Non-Propensity Purposes.*

¶24 Here, on cross-examination, defense counsel attempted to undermine the credibility of the girls' Mother, the initial complaining witness, by questioning her about the tension and acrimony between her and the defendant regarding their breakup, and further suggesting that she had since attempted to "inhibit the ability of the [d]efendant's family to see the girls." During the defense case-in-chief, McGhee attempted to further impugn the Mother by testifying that her infidelity was the primary reason for their breakup and that she had since been unwilling to communicate with him regarding their children. The manifest purpose of McGhee's cross-examination of the Mother, and his subsequent testimony further impugning her, was to suggest that she was biased and had a motive to fabricate the charged allegation and thus testify falsely against him.

¶25 In support of his denial of the alleged indecent exposure, McGhee also testified, and elicited similar testimony from his girlfriend and brothers, that he had always had a good relationship with his daughters prior to the charged allegation by the Mother in 2018. In addition to testifying to his "awesome" relationship with his daughters, he further testified that, prior to the charged allegation, they had always wanted to live with him, and that he had no reason to believe that they did not want to be around him. The obvious purpose of

21

McGhee's testimony, and the consistent testimony of his brothers and girlfriend, regarding his great relationship with his daughters was to create the impression that he had always been a loving and caring father, to which the subject allegation of indecent exposure was wholly inconsistent, thus supporting a jury inference that he was not guilty of the charged offenses. The combined purpose of the intended good character/not guilty inference and related attack on Mother's credibility was to further provide an alternative explanation for the charged allegation, *i.e.*, that Mother fabricated the allegation and then orchestrated the girls' subsequent affirmation in furtherance of her bias and motive to fabricate and testify falsely against him.

¶26 Under these circumstances, cross-examination of McGhee regarding the prior allegations that he did "something inappropriate with [his] daughters," and had "been accused of this kind of behavior before," was directly relevant under M. R. Evid. 401-02, 404(a)(1), 607(a), and the other purposes exception to Rule 404(b) as non-propensity impeachment evidence contradicting his good character testimony and his related assertion that he had no prior reason to believe that his daughters did not want to be around him. As recognized in *Passmore*, the limited cross-examination regarding the prior allegations was not only relevant to directly contradict McGhee's assertions regarding his relationship with his daughters and that he had no reason to believe they did not want to be around him, but also to then similarly undermine the credibility of the balance of his testimony, including his denial of the allegation. *See Passmore*, ¶ 59 (discussing two-pronged effect of impeachment by contradiction). Moreover, as in *Guill*, it was further relevant under M. R.

22

Evid. 401-02 and the other purposes exception to Rule 404(b) for the related non-propensity purpose of rebutting his implied assertion of the Mother's bias and motive to fabricate and testify falsely and, as in *Clemans*, to correct his intended false impression regarding her negative view of him and motivation in fabricating and reporting the subject allegation.

     (G) *Rule 403 Limiting Factors*.

¶27 McGhee further asserts that, "[e]ven if the [other acts] evidence were properly deemed admissible, [the] prejudicial effect substantially outweighed any probative value and was thus inadmissible under Rule 403." Otherwise relevant evidence is nonetheless subject to exclusion "if its probative value is substantially outweighed by," *inter alia*, "the danger of unfair prejudice." M. R. Evid. 403. Here, aside from his failure to clearly assert a similar objection below, McGhee's assertion of unfair prejudice is problematic because he at the same time acknowledges that "[t]here was no discussion of the actual merits of the North Dakota allegations" and that "the State raised the issue" to correct or rebut his assertion "as to why [he and the girls' Mother] have never gotten along." He further asserts, "[m]ore importantly," that the North Dakota allegations "could not have been probative of anything" because the State had "admittedly not even seen most of the evidence in [that] case."

¶28 However, in pertinent part, the limited cross-examination went no farther than asking McGhee if he had previously been accused of "doing something inappropriate with [his] daughters" involving "this kind of behavior," and whether that might explain

23

Mother's animosity toward him, rather than his assertion of her alleged bias and motive to fabricate and testify falsely against him. As previously noted, the limited cross-examination allowed had significant non-propensity relevance for impeachment and rebuttal purposes. Aside from more clearly revealing his assertion of fabrication and orchestration by Mother, and his related assertion that his daughters were thus lying, the related questioning on cross-examination and redirect further disclosed only an undetailed law enforcement investigation that resulted in no charges, a related civil protective order pending the investigation, and ultimate restoration of McGhee's parenting rights under the prior parenting plan. The cross-examination did not reference or require disclosure of the much-more graphic and alarming particulars of the prior allegations of sexual misconduct toward his daughters. Under these circumstances, the fact that the State may not have had detailed knowledge of the particulars of the North Dakota investigation had no diminishing effect on the probative value of the limited subject matter of the cross-examination for the impeachment and rebuttal purposes to which it pertained. We accordingly find no basis upon which the District Court should or could have concluded that the risk of unfair prejudice substantially outweighed the probative value of the limited cross-examination regarding the North Dakota allegations.

(H) *Alleged Unwarranted Reversal of Exclusionary Ruling In Limine.*

¶29 McGhee further asserts that the mid-trial allowance of cross-examination regarding the prior North Dakota allegations violated or constituted an erroneous reversal of the court's pretrial exclusionary ruling in limine. However, as a threshold matter, the ruling in

24

limine was responsive, and thus limited in scope, to precluding the State from presenting or referencing the prior allegations for the asserted Rule 404(b) purpose of proving that he committed the charged offense in accordance with a "common plan, motive, or intent." The ruling *in limine* thus had no bearing on whether the development of the actual evidence at trial might later cause the prior North Dakota allegations to become relevant and admissible for some other purpose distinct from the purpose originally proposed by the State and rejected by the court.

¶30 Complicating the situation, we recognize that the Rule 404(b) non-propensity limiting instruction included in the pre-deliberation jury instruction set nonetheless erroneously instructed the jury that the only permissible purpose for admission and consideration of the other acts evidence discussed during the trial was as proof that McGhee committed the charged offense in accordance with a common plan, motive, or scheme. However, McGhee did not contemporaneously object to the adequacy of the limiting instruction below, nor has he raised that issue on appeal under any exception to the contemporaneous objection/waiver rule. The narrow focus of McGhee's objection below was on the threshold relevance of the other acts evidence under M. R. Evid. 401-02 and 404(b). He further acknowledges on appeal that the "State raised the issue not to prove motive, intent, or any of the admissible exception[s] to 404(b), but instead [to] muddy the waters as to why [he and the girls' Mother] have never gotten along."

¶31 We generally will not hold a district court in error on a subsequent assertion in regard to which the aggrieved party acquiesced by failing to object, thus precluding the

opportunity for direct consideration and correction. *State v. Daniels*, 2011 MT 278, ¶ 36, 362 Mont. 426, 265 P.3d 623 (quoting *State v. English*, 2006 MT 177, ¶ 71, 333 Mont. 23, 140 P.3d 454); *State v. Clausell*, 2001 MT 62, ¶ 25, 305 Mont. 1, 22 P.3d 1111. Having found the limited cross-examination regarding the prior allegations relevant for non-propensity impeachment and rebuttal purposes, and no merit to McGhee's assertion of Rule 403 prejudice, we have no basis upon which to conclude that any resulting prejudice from the partially erroneous Rule 404(b) limiting instruction substantially outweighed the significant probative value of the limited cross-examination allowed. *See similarly, State v. Howell*, 254 Mont. 438, 445, 839 P.2d 87, 91 (1992) (erroneous inclusion of extraneous statement of purpose in Rule 404(b) limiting instruction insufficient to result in substantial prejudice precluding admission of otherwise relevant other acts evidence).

¶32   While the District Court did not sequentially step through the foregoing analysis due to the limited manner in which the parties raised and addressed the issue, we have long adhered to the principle that we have discretion on appellate review to independently examine the record and affirm a lower court judgment that reached the correct result, even if for a wrong or incomplete reason. *See, e.g., State v. Marcial*, 2013 MT 242, ¶ 10, 371 Mont. 348, 308 P.3d 69; *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646; *State v. Hendershot*, 2009 MT 292, ¶ 33, 352 Mont. 271, 216 P.3d 754. Under the totality of the circumstances of this case, we hold that the District Court did not erroneously conclude that McGhee "opened the door" to the limited cross-examination allowed regarding the otherwise inadmissible North Dakota allegations.

26

¶33   2. *Whether the District Court erroneously imposed an unduly harsh sentence?*

¶34   Criminal sentences eligible for statutory sentence review are subject to review on direct appeal only for legality. *Herd*, ¶ 22; *State v. Hinshaw*, 2018 MT 49, ¶ 7, 390 Mont. 372, 414 P.3d 271 (internal citations omitted). A sentence is eligible for sentence review if it includes an unsuspended prison term or Department of Corrections commitment of "1 year or more." *See* § 46-18-903(1), MCA; *Herd*, ¶¶ 19-23. Sentence review is generally the exclusive remedy for relief from eligible sentences challenged on the basis of "equitability," *i.e.*, undue harshness, based on the length of the sentence or its "proportionality to the crime." *Jordan v. State*, 2008 MT 334, ¶ 18, 346 Mont. 193, 194 P.3d 657 (citing *State v. Kern*, 2003 MT 77, ¶ 54, 315 Mont. 22, 67 P.3d 272). *Accord Bull*, ¶¶ 11 and 13.

¶35   Here, McGhee does not allege that he received an illegal sentence. Without citation or analysis regarding the appropriate remedy for relief, he merely asserts that his sentence is "unduly harsh." The State correctly asserts that his sentence is eligible for sentence review, and thus not subject to review on direct appeal. McGhee filed no reply disputing the State's assertion. We agree with the State and summarily hold that McGhee's sentence is subject to sentence review, and thus not subject to review on direct appeal.[6]

---

[6] The record indicates that McGhee applied for sentence review in September 2019. Due to the pendency of this appeal, the Sentence Review Division responded that the application was premature and thus instructed him to timely refile within 60 days of final judgment on appeal.

## CONCLUSION

¶36   Under the circumstances of this case, we hold that the District Court did not erroneously conclude that McGhee "opened the door" to the limited cross-examination allowed regarding the otherwise inadmissible North Dakota allegations.  We hold further that, based on his eligibility for statutory sentence review, McGhee's assertion that his sentence is "unduly harsh" is not subject to review on direct appeal.  Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices