FILED

04/11/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0028

DA 21-0028

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 63

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

TIMOTHY JOHN STRYKER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and For the County of Rosebud, Cause No. DC 19-39
Honorable Nickolas C. Murnion, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kathryn Hutchison, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Michael P. Dougherty,
Assistant Attorney General, Helena, Montana

          C. Kristine White, Rosebud County Attorney, Forsyth, Montana

          Submitted on Briefs:  November 16, 2022

                    Decided:  April 11, 2023

Filed:

_____
               Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Timothy John Stryker appeals from the judgment entered by the Sixteenth Judicial District Court, after jury trial, adjudging him guilty of incest in violation of § 45-5-507(1), (5)(a)(i) MCA. He challenges the District Court's evidentiary ruling admitting evidence of other acts. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Timothy Stryker and Rachel Showalter met through horse training activities, which Stryker coached and in which Rachel's daughter, F.S. participated competitively, beginning when she was four years old. Stryker and Rachel were married in 2018, and they, along with Rachel's two children, F.S. and her twin brother, began living together on Stryker's ranch in Buffalo, Wyoming. The family was considered close, with each person helping on the ranch and Stryker's horse training business, and actively riding horses.

### Wyoming Allegations

¶3 On an evening in June of 2019, Stryker, Rachel, and the twins, then 10 years old, were on the couch, watching TV. They drifted in and out of sleep and, during the night, Rachel opened her eyes and observed Stryker's hand under F.S.'s shirt, rubbing her body, including her breast area. In the morning, Rachel and F.S. were together in the barn, and Rachel asked F.S. about what Stryker was doing. F.S. answered that she did not like Stryker's back rubs, and disclosed that Stryker had, on previous occasions, touched her inappropriately on her breasts and buttocks. Rachel took the twins, drove into town, and called an individual she knew at the Wyoming Department of Family Services (DFS). Later that day, Kari Packard, a DFS social worker, conducted a forensic interview of F.S.

in which she disclosed that, over the prior few weeks, Stryker had touched her buttocks and breasts on two other occasions, with the first time being when F.S. was in her bedroom.

¶4 Deputy Keeler and Sheriff Odenbach of the Johnson County Sheriff's Office interviewed Stryker that evening. Stryker initially denied touching F.S. inappropriately, but later stated that, while giving F.S. back rubs, he may have accidentally touched her buttocks, breasts, and nipples. The following day, Stryker called Deputy Keeler and asked to meet again to talk further. On the way to that meeting, Keeler received a phone call from Rachel, who informed him F.S. had also disclosed that Stryker had touched her vagina while they were staying at the Lee Ranch in Montana in April, about six weeks earlier. During Keeler's second interview, Stryker again admitted to touching F.S. in Wyoming, while she was in bed, but denied any touching had occurred in Montana. Stryker explained that, on another occasion, he went into F.S.'s bedroom early in the morning to get her ready for school, and while she was still asleep in bed, rubbed the outside of her vagina. When Keeler asked why someone would touch F.S. the way he had, Stryker responded "pleasure" and "[i]nstinct," and that, "I guess it wouldn't happen if there wasn't some sort of physical attraction."

¶5 Deputy Keeler suggested that Stryker could write a letter of apology to help F.S. heal from the ordeal, and provided pen and paper. Stryker wrote apology letters to F.S., as well as to Rachel, his family and his friends. In the apology letter to Rachel, Stryker wrote: "[h]ave no idea where this all came from. Can't even wrap my own mind around it still. No excuse, it is what it is . . . Still no excuse and like I said before I know you can[']t forgive me and I don't really even want you to." In his letter to family and friends, Stryker

3

wrote "[s]orry to disappoint you all. This is not me and I know without a doubt you all know that. No excuses, will maybe someday figure it all out." Stryker was charged in Wyoming with the felony of Sexual Abuse of a Minor. However, prior to the Wyoming case proceeding to trial, he was extradited to face a felony incest charge in Montana under § 45-5-507(1), (5)(a)(i), MCA.

**Montana Allegation**

¶6 As noted, during the Wyoming investigation, F.S. disclosed that Stryker had also touched her inappropriately in Montana about six weeks earlier. Stryker and F.S. took a trip to Colstrip, Montana, over two days, April 27-28, 2019, to help with spring branding at the Lee Ranch. This was not the first time Stryker and F.S. had gone to the Lee Ranch. When they arrived, Jeff Bilharz, ranch foreman, asked F.S. where she wanted to sleep. In her trial testimony, F.S. stated Stryker had answered the question, saying F.S. could just sleep with him in a bedroom. F.S. testified she spent the night in the room with Stryker, and described the room in detail. Relating this incident to Rachel, F.S. provided an account of specific contact Stryker initiated while they were in bed early in the morning, with Stryker touching her buttock, vagina, and breasts under her clothes. To leave the room, F.S. said she had to go to the bathroom and got up. She did not return to the bedroom, but got some cereal and went into the living room.

¶7 Stryker provided a differing account at trial, stating F.S. had slept on the living room couch, not in the bedroom. He called three witnesses, each of whom testified they saw F.S. sleeping on the couch in the living room, rather than with Stryker. Bilharz testified he was the first one to go bed and the first one to rise, at which point he saw F.S. sleeping on the

4

couch. On cross-examination, Bilharz was asked to read a text message exchange between himself and Rachel wherein Rachel asked Bilharz where F.S. had slept that night, stating: "So I have an odd question. Just trying to wrap my mind around this shit. That night of your branding when you told Tim there were two rooms available what did he say? Give it to me strai[gh]t." Bilharz responded:

> He asked [F.S.] w[h]ere she wanted to sleep and she shrugged her shoulders & said I don't care & Tim asked if she just wanted to bunk with [him] & she said sure! & Tim said there u don't have to mess up another bed & less work for Jeff & I said cool! That's pretty much a quote [emoji] and the next morning everyone seemed fine [emoji][.]

After he read this text message, Bilharz explained that he could not finish the message at the time because he was on horseback, but if he could have finished it, he would have also stated that he saw F.S. lying on the couch.

¶8 Second, James Beier testified he heard F.S. say she was going to sleep on the couch, and when he went to sleep, she was asleep on the couch and Stryker had retired to the bedroom. Third, Kolton Kimmel testified that F.S. slept on the couch and, due to his bad back, he slept on the living room floor, which meant that if F.S. wanted to move, she would have had to step over him.

**Trial**

¶9 Stryker filed a pre-trial motion in limine to exclude evidence of "other acts committed between the Defendant and F.S." The State sought to have Rachel testify about seeing Stryker touch F.S. during the night while on the couch, Stryker's admissions to touching F.S. on multiple occasions through testimony of the officers, and the apology letters Stryker wrote. In response, the State argued the evidence would be used to prove a

5

pattern of behavior, motive, opportunity, and absence of mistake or accident. The District Court denied the motion, reasoning that "[t]he evidence of the subsequent acts of inappropriate and sexual touching tend to show that sexual attraction to the victim was the motive of the Defendant . . . . to 'arouse or gratify the sexual response' of the Defendant as alleged in the Amended Information," and "also shows opportunity and pattern of behavior by the Defendant." The District Court noted that all of the alleged acts by Stryker "involved massaging and cuddling with the victim which [led] to sexual touching." Noting that Stryker had implied that some of the touching was unintentional or inadvertent, the District Court stated that the evidence would also "show absence of mistake or accident." The District Court also ruled the evidence was admissible under the transaction rule, and, lastly, held that the probative value of the evidence was not outweighed by the risk of unfair prejudice or potential confusion.[1]

¶10    At trial, the District Court provided a limiting instruction before the State elicited any of the Wyoming evidence. The court read the limiting instruction prior to F.S. testifying about the other times Stryker had touched her. The court read the limiting instruction prior to Rachel testifying about her seeing Stryker touch F.S. on the couch, and again prior to Rachel testifying about her conversation with F.S. in which she had initially disclosed Stryker's actions. The court also read the limiting instruction prior to Deputy Keeler's testimony about his conversations with Stryker wherein Stryker admitted he had

---

[1] The District Court did not address in its order the letters written by Stryker, and no further objection or discussion was made in that regard.

6

touched F.S. During his testimony, Deputy Keeler explained that, in both of his interviews, Stryker denied any inappropriate touching had occurred in Colstrip. The jury returned a guilty verdict.

¶11 Stryker appeals, challenging only the admission of the Wyoming evidence.

## STANDARD OF REVIEW

¶12 This Court reviews a district court's ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion. *State v. Haithcox*, 2019 MT 201, ¶ 14, 397 Mont. 103, 447 P.3d 452. Trial courts have "broad discretion to determine the admissibility of evidence in accordance with the Montana Rules of Evidence and related statutory and jurisprudential rules." *State v. McGhee*, 2021 MT 193, ¶ 10, 405 Mont. 121, 492 P.3d 518. We leave those decisions "undisturbed unless made 'arbitrarily without the employment of conscientious judgment or exceed[ing] the bounds of reason, resulting in substantial injustice.'" *State v. Murphy*, 2021 MT 268, ¶ 8, 406 Mont. 42, 497 P.3d 263 (quoting *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811 (citations omitted)).

## DISCUSSION

¶13 Stryker contends the District Court erred by admitting the Wyoming evidence under Rule 404(b), but primarily challenges the manner in which the evidence was used as a violation of Rule 403, his arguments implicitly acknowledging that the Wyoming evidence, in some degree, could have been properly admitted ("While there may arguably be narrow, limited value to the Wyoming evidence to prove motive, not to the extent the State proposed"; "[s]ome limited reference to subsequent conduct in Wyoming could have been permissible without running afoul of Rule 403, but the State's ambiguous emphasis . . .

was distracting, misleading and ran a high risk of confusing the jury."). He thus argues that the District Court erred because "the evidence under this theory should have been tightly limited under Rule 403."

¶14 M. R. Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Rule does not bar evidence, but rather prohibits a "theory of admissibility"—using evidence of other crimes or wrongs to prove the defendant's subjective character "in order to show conduct in conformity with that character on a particular occasion." *State v. Dist. Court of the Eighteen Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 (*Salvagni*). The "purpose of this general rule is to preclude an impermissible jury inference, based on evidence of other uncharged bad acts or allegations, that an accused is a person of bad character, and thus likely guilty of the charged offense based on common experience or belief that persons of bad character are predisposed or have a tendency or propensity to subsequently act in conformance therewith." *McGhee*, ¶ 14.

¶15 Rule 404(b) further provides that such evidence may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). We have explained that "'[t]he distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance.'" *State v. Daffin*, 2017 MT 76, ¶ 15, 387 Mont. 154, 392 P.3d 150 (quoting *State v. Madplume*, 2017 MT 40, ¶ 23, 386 Mont. 368, 390 P.3d 142). Further, we have stated that "trial court[s] must ensure that any

8

permissible use of evidence that could be barred under Rule 404(b) is 'clearly justified and carefully limited.'" *State v. Flowers*, 2018 MT 96, ¶ 20, 391 Mont. 237, 416 P.3d 180 (quoting *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648).

¶16 Although, as explained above, the District Court admitted the Wyoming evidence on several grounds under Rule 404(b), we affirm that the evidence was properly admitted upon narrower grounds. We agree that motive was a proper basis here. While we have explained motive can be "a broad, nebulous concept" that is too general to serve as a proper basis for introduction of Rule 404(b) evidence, *State v. Blaz*, 2017 MT 164, ¶ 14, 388 Mont. 105, 398 P.3d 247, motive served as a proper basis here. Stryker's sexual attraction to his 10-year-old step-daughter F.S. was unnatural and unexpected, but nonetheless clearly motivated his conduct, which began in Colstrip and continued thereafter in Wyoming, and which he acknowledged to Wyoming police. When asked why he would engage in such conduct, Stryker answered Deputy Keeler that it was for "pleasure" and a "physical attraction." Proof of Stryker's motive was a legitimate concern of the State in carrying its burden on the Montana charge, including proving the element of "to knowingly or purposely arouse or gratify the sexual response or desire of either party," and properly established a basis for admission of the Wyoming evidence. "[T]he motive is cause, and the charged and uncharged acts are effects; that is, both acts are explainable as a result of the same motive." *Salvagni*, ¶ 59.

¶17 Perhaps more significantly, the Wyoming evidence was also admissible under Rule 404(b) to establish Stryker's specific pattern of behavior, sometime referred to as *modus operandi*, *see Salvagni*, ¶ 56, or "plan" and "preparation" under Rule 404(b). As the

9

District Court noted, Stryker's actions toward F.S. occurred in similar circumstances. Each occurred during night or bedtime, and F.S. was always sleeping or in bed inside a house, as alleged here. Likewise, Stryker's physical contact with F.S. was similar on each occasion. F.S.'s account of the Colstrip event included Stryker's touching of her buttock, vagina, and breasts under her clothes, consistent with the manner of Stryker's touching during the Wyoming incidents. Stryker did not, for example, attempt intercourse or other penetration of F.S. during the Wyoming incidents, nor at Colstrip. Establishing this plan or mode of operation also served to undermine Stryker's contention that he did not ask for F.S. to sleep in the bedroom with him at Colstrip, but rather, that F.S. had slept on the living room couch, thus serving to counter Stryker's defense that F.S. had not slept with him and, therefore, he had no opportunity and did not touch her during the night. In this regard, this case is similar to *State v. Madplume*, 2017 MT 40, 386 Mont. 368, 390 P.3d 142, wherein we affirmed the admission of evidence of Madplume's other acts, citing them as relevant evidence of opportunity, intent, preparation, motive, and plan:

> The District Court noted several key similarities between the two events: on both occasions Madplume directed the parties to the same private plunge room at Wild Horse; on both occasions Madplume provided the alcohol and encouraged the alcohol use by both victims; in both cases Madplume brought along a younger cousin to make the victim feel more comfortable; in both cases Madplume maneuvered himself into intimate proximity with an isolated victim; and on both occasions the alleged sexual contact and altercations between Madplume and the victims took place while the younger cousin was out of the room. The circumstantial similarity and nearness in time of the two events were logically relevant to show Madplume's common plan, motive, and intent.

*Madplume*, ¶ 26. We reach the same conclusion here, and need not address the further bases relied upon by the District Court to admit the evidence, including the transaction rule.

10

¶18     Secondarily, Stryker argues that, even if the Wyoming evidence was properly deemed admissible, it was used in a manner that confused the jury about the charge for which he stood trial, should have been more limited, and therefore unfairly prejudiced him under the balancing test of Rule 403. Rule 403 allows admissible evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." M. R. Evid. 403. Stryker also argues the jury "was inundated with evidence of [Stryker's] Wyoming acts" and thus, "the way the State presented the disputed evidence misled the jury."

¶19     Rule 403 embodies a process of weighing the probative value of the evidence against the dangers of unfair prejudice, confusion of the issues, or misleading the jury. We have explained that "[p]robative evidence in criminal proceedings is usually, if not always, prejudicial to the defendant. . . .  In fact, the prosecutor must present evidence that is prejudicial to the defendant to obtain a conviction." *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149. However, "[e]ven if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must *substantially outweigh* the evidence's probative value. M. R. Evid. 403." *Madplume*, ¶ 33 (emphasis added).

¶20     Thus, the balancing process begins with an assessment of the strength of the probative value of the challenged evidence. We have determined Rule 404(b) evidence was minimally probative when it, "at best, had only ancillary relevance to the facts centrally at issue in the case." *State v. Lake*, 2022 MT 28, ¶ 43, 407 Mont. 350, 503 P.3d 274. Similarly, while we have "long recognized that adequate limiting instructions under

M. R. Evid. 105 are often sufficient to eliminate, or at least reduce, the risk of unfair prejudice where prior bad acts evidence is both highly relevant and inherently prejudicial," we have explained, "[n]ot so, however, when the relative probative value of the evidence is minimal or non-existent, and the relative danger of unfair prejudice is high." *Lake*, ¶ 43.

¶21 Thus, it is significant to the Rule 403 analysis that the 404(b) evidence at issue here was highly probative. It demonstrated that Stryker had an attraction to F.S. that motivated him to touch her with the purpose of gratifying his sexual desire, an element of the offense, after Stryker and F.S. left their Wyoming home and drove together to Montana. That led to the highly relevant evidence of Stryker's consistent methods or mode of initiating physical contact with F.S., during the night while F.S. and others were sleeping, and the consistent manner in which Stryker had touched F.S., just as 11-year-old F.S. explained had happened on that occasion. In turn, the evidence of Stryker's consistent methods countered his defense, supported by three friends of Stryker, that F.S. had not slept with Stryker that night, and thus Stryker had no opportunity to commit the crime. Taken individually, these 404(b) offerings have differing probative values, but taken together, they clearly did not provide merely "ancillary relevance to the facts centrally at issue in the case," but significant probative weight. *Lake*, ¶ 43.

¶22 Consequently, this is likewise not a case where "the relative probative value of the [Rule 404(b)] evidence is minimal or non-existent" such that a limiting instruction is necessarily rendered ineffectual. *Lake*, ¶ 43. The District Court prepared its own limiting instruction, admonishing the jury five times during the trial that they could not consider the Wyoming evidence "as substitute for proof that the defendant committed Incest charged

12

in Montana." The District Court gave the instruction before F.S. testified, before social worker Kari Packard testified, before Rachel testified, once again at a point during Rachel's testimony, and during Detective Keeler's testimony. "[J]uries are presumed to follow the law provided by courts." *State v. LaFournaise*, 2022 MT 36, ¶ 41, 407 Mont. 399, 504 P.3d 486 (citation omitted). Beyond the District Court's diligence to re-instruct the jury repeatedly about the limited purpose of the Wyoming evidence as it was being admitted, which the prosecutor requested on several occasions, the prosecutor also directly reminded the jury during both opening and closing statements that they could not convict Stryker based upon the Wyoming allegations. It is clear the District Court and prosecutor took seriously the concerns about Rule 404(b) evidence and endeavored to eliminate unfair prejudice in its use.

¶23 Further regarding prejudice, the State did not simply request a conviction on the basis of the 404(b) evidence. The prosecutor attacked Stryker's defense, raising the inconsistencies between the testimony of three witnesses, including the exchange of text messages wherein Bilharz, in response to Rachel's request that he "give it to [her] strai[gh]t" about what had happened that night, failed to even mention the fact, which he would later offer at trial, that F.S. had not slept with Stryker, but instead slept on the living room couch. More critically, the prosecutor provided the testimony of F.S., who gave remarkably clear testimony, providing a matter-of-fact description of the Montana physical abuse she experienced, and where and when it occurred, in a manner uncharacteristic of her age. This alone was legally sufficient to support the conviction. *See State v. Bowen*,

13

2015 MT 246, ¶ 30, 380 Mont. 433, 356 P.3d 449 ("The testimony from any one witness, that the jury believes, is sufficient to prove any fact in a case.").

¶24 Stryker's Rule 403 argument includes contentions that the jury was confused or misled by the 404(b) evidence. While the defense's objection to the admission of the evidence was preserved through a motion in limine, there was no objection during the trial that the manner in which the State introduced the evidence was causing confusion or was misleading in any way. Wyoming Officer Keeler testified clearly that Stryker had insisted in both of his interviews that, while he had abused F.S. in Wyoming, he had not done so in Montana. The evidence, including F.S.'s testimony, the instructions, and the arguments all focused on the question of whether Stryker had committed a crime in Montana.

¶25 We acknowledge Stryker has raised a legitimate concern about the volume of 404(b) evidence admitted in this case, as we have instructed trial courts to "carefully limit[]" the use of permissible 404(b) evidence. *Flowers*, ¶ 20 (quoting *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648). We also recognize that the circumstances in this case produced an unusual amount of potential 404(b) evidence because F.S. had been abused in Wyoming on multiple occasions and an investigation had already been conducted there, involving numerous individuals who could provide testimony. While we continue to caution trial courts about limiting such evidence, under the circumstances here we cannot conclude that the considerable probative value of the evidence was "substantially outweighed" by the risk of unfair prejudice, given the extensive precautions taken by the State and District Court, the instructions about the Montana offense, and clarity of the

State's other evidence. We thus conclude the District Court did not abuse its discretion herein.

¶26 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA

Justice Ingrid Gustafson dissenting.

¶27 I dissent. I would hold the District Court erred by denying Stryker's motion in limine and determining evidence that Styker admitted to sexually abusing his stepdaughter, F.S., in Wyoming was relevant and admissible under M. R. Evid. 404(b), determining such evidence was separately admissible under the transaction rule, § 26-1-103, MCA, and determining the probative value of the evidence did not outweigh the danger of unfair prejudice under M. R. Evid. 403 in either scenario. In upholding the District Court on narrower grounds, the Court determines the evidence was relevant and admissible to prove "motive," "plan," and "preparation" under Rule 404(b), and finds that the danger of unfair prejudice was cured by the District Court's numerous and repeated limiting instructions.

¶28 Stryker is a cutting horse trainer who first met F.S. through horse training activities when she was approximately four years old. Stryker became romantically involved with F.S.'s mother, Rachel, and the two married in 2018, settling with F.S. and her twin brother

15

on a ranch near Buffalo, Wyoming. Stryker coached F.S. in competitive cutting horse competitions. The entire family was involved in horse training and ranch operations.

¶29 In June of 2019, Rachel observed Stryker rubbing F.S.'s breasts under her shirt while the family fell asleep in the living room of their Wyoming home. The next day, F.S. disclosed to Rachel that Stryker had inappropriately touched her. F.S. later had a forensic interview, at which she disclosed that Stryker had started inappropriately touching her on her breasts and buttocks at their Wyoming home during the last two weeks of school. Deputy Keeler of the Johnson County (Wyoming) Sheriff's Office thereafter set up an interview with Stryker. During this interview with Deputy Keeler and Johnson County Sheriff Rod Odenbach, Stryker mentioned taking a trip to Colstrip with F.S. to help out a friend when giving an example of how he and F.S. were "best pals for a lot of years" and "spent a lot of time together." Stryker noted it was a long trip to Colstrip, and was "usually an overnight deal, sometimes two nights." As the interview continued, Stryker eventually admitted to touching F.S. on her breasts, buttocks, and nipples at their Wyoming home. After the interview ended, Rachel conducted a recorded phone call with Stryker, in which he again admitted to touching F.S.'s nipple at their Wyoming home.

¶30 The next day, Stryker contacted Deputy Keeler and asked him to talk some more. While Deputy Keeler was driving out to meet with Stryker, he received a phone call from Rachel, who informed him that F.S. told her Stryker had also touched her vagina, both in Wyoming and, for the first time, in Colstrip. Deputy Keeler and Sheriff Odenbach conducted another recorded interview with Stryker after this disclosure. Stryker waived

16

his *Miranda* rights[1] and spoke with Deputy Keeler and Sheriff Odenbach. Over the course of this interview, Stryker repeatedly admitted to touching F.S. on the breasts, buttocks, nipples, and vagina at their home in Wyoming. Deputy Keeler and Sheriff Odenbach also repeatedly questioned Stryker about what happened in Colstrip. Each time, though he had admitted to inappropriately touching F.S. in Wyoming, Stryker adamantly denied ever touching F.S. in Colstrip. At the end of the interview, Stryker was arrested by the Wyoming authorities for felony sexual abuse of a minor.

¶31    In July of 2019, Deputy Keeler contacted Rosebud County Deputy Sheriff John O'Toole to inform him of the Colstrip allegations. Deputy Keeler then forwarded his investigative file to Deputy O'Toole. Deputy O'Toole did not investigate the Montana allegations beyond speaking with Rachel, who was not on the Colstrip trip, and did not attempt to locate or interview any of the numerous people who stayed at the ranch with Stryker and F.S. on the night in question. Deputy O'Toole forwarded Deputy Keeler's investigative file to the Rosebud County Attorney's Office, which thereafter charged Stryker with one count of felony Incest for touching F.S.'s vagina while in Colstrip.

¶32    Before trial, Stryker filed a motion in limine to preclude the State "from commenting upon, or eliciting any testimony through the course of these proceedings pertaining to, any offense, wrongs, or acts of [Stryker] for which he is not charged in the current case," and specifically from introducing "any evidence referencing allegations of other allegations between [Stryker] and F.S." Styker asserted the evidence of his Wyoming

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

admissions did not meet any exception to Rule 404(b), were not inextricably linked such that they would be admissible under the transaction rule, and were unfairly prejudicial under Rule 403. The State responded that the evidence was admissible under the transaction rule, further admissible under the "motive, opportunity, intent, and/or absence of mistake or accident" exceptions to Rule 404(b), and that any danger of unfair prejudice could be cured by a limiting instruction. The District Court denied Stryker's motion in limine. The court found the evidence of Stryker's sexual contact with F.S. in Wyoming, which occurred 43 days after the purported offense in Montana, was admissible under the exception to Rule 404(b), separately admissible under the transaction rule, and that the probative value of the allegations was not outweighed by the danger of unfair prejudice and could be cured by giving a limiting instruction.

¶33 The matter went to a three-day trial, at which the jury heard testimony from the State's blind expert in child sexual abuse Wendy Dutton; F.S.; F.S.'s forensic interviewer in Wyoming, Kari Packard; Rachel; Deputy Keeler; Deputy O'Toole; and three men who were at the ranch in Colstrip with Stryker and F.S. on the night in question: Jeff Billharz, James Beier, and Kolten Kimmel. During the testimony of F.S., Packard, Rachel (twice), and Deputy Keeler, all of whom testified to Stryker's touching of F.S. in Wyoming, the District Court read a limiting instruction which stated:

> The State will now offer evidence that the Defendant at another time engaged in other acts, that evidence was not admitted to prove the character of the Defendant or to show he acted in conformity [therewith], the only purpose of admitting that evidence was to show proof of motive, opportunity, plan, or absence of mistake or accident. You may not use that evidence for any other purpose. You may not consider evidence of other acts as a substitute for proof that the Defendant committed the incest charged in Montana. The

18

> Defendant is not being tried for that other act. He may not be convicted for any other offense than that charged in this case. For the jury to convict the Defendant of any other offense than that charged in this case may result in unjust double punishment of the Defendant.

A similar version of this instruction was also given by the court as Instruction Nine prior to the jury's deliberations.

¶34 Regarding the Colstrip incident, F.S. testified she slept with Stryker in a bedroom and was inappropriately touched by him in the morning before going to the bathroom and then into the kitchen, where Billharz's wife, Tara, was making breakfast. Tara was never interviewed by law enforcement or called to testify at trial. Billharz, Beier, and Kimmel, who had each earlier provided statements saying F.S. slept on the couch and not in the bedroom, all testified that F.S. slept on the couch in the living room in the presence of two other people, not in a bedroom with Stryker. Deputy Keeler testified that he did not conduct any follow-up investigation of the Colstrip incident but forwarded the information to a deputy in Colstrip. Deputy O'Toole testified that he did not go out to the ranch to investigate or contact any of the people who were there on the night in question because he considered Stryker—who had already been arrested and charged with felony child sexual abuse in Wyoming—to be a flight risk who "could [g]o to the mountain and remain uh off radar for an extended period of time."

¶35 At trial in Montana, the only evidence presented to the jury with regard to the Montana charge was F.S.'s testimony asserting Stryker inappropriately touched her while they slept in the same room during a visit to friends in Montana and Billharz, Beier, and Kimmel's testimony refuting F.S.'s claim that she slept in the same room as Stryker.

19

Instead, the vast majority of the evidence presented to the jury involved the investigation and admission of the charges brought in Wyoming. Ultimately, the jury found Stryker guilty of Incest for touching F.S. in Colstrip. The District Court sentenced Stryker to 100 years at the Montana State Prison, with 90 years suspended, and imposed a 10-year parole restriction. Following his Montana trial, Stryker entered an *Alford* plea[2] to one felony count of Sexual Abuse of a Minor in the Second Degree in Wyoming. The Wyoming court sentenced Stryker to a prison term of not less than 15 years and not more than 20 years at the Wyoming State Penitentiary. Stryker now appeals the denial of his motion in limine and the admission of the Wyoming evidence at trial.

¶36 We review a district court's ruling regarding the admission of other crimes, wrongs, or acts for an abuse of discretion. *State v. Haithcox*, 2019 MT 201, ¶ 14, 397 Mont. 103, 447 P.3d 452 (citing *State v. Crider*, 2014 MT 139, ¶ 14, 375 Mont. 187, 328 P.3d 612). An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142 (citing *State v. Spottedbear*, 2016 MT 243, ¶ 9, 385 Mont. 68, 380 P.3d 810). To the extent a district court's evidentiary ruling is based upon an interpretation of a rule of evidence or a statute, however, our review

---

[2] An *Alford* plea arises from the United States Supreme Court's decision in *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160 (1970) and allows a defendant to plead guilty to an offense without acknowledging his guilt. *State v. Peterson*, 2013 MT 329, ¶ 8, 372 Mont. 382, 314 P.3d 227 (citing *State v. Locke*, 2008 MT 423, ¶ 18, 347 Mont. 387, 198 P.3d 316). In Wyoming, just as it is in Montana, "an *Alford* plea is a guilty plea." *McEwan v. Wyoming*, 2013 WY 158, ¶ 15 n.4, 314 P.3d 1160 (citations omitted).

is de novo. *Haithcox*, ¶ 14 (citing *State v. Lotter*, 2013 MT 336, ¶ 13, 372 Mont. 445, 313 P.3d 148).

¶37   In this case, the District Court denied Stryker's motion in limine to preclude the State from introducing "any evidence referencing allegations of other allegations between [Stryker] and F.S."  The District Court flatly denied Stryker's motion in limine and ruled such evidence was relevant and admissible under both Rule 404(b) and the transaction rule, and did not run afoul of Rule 403's prohibition on the admission of evidence when its probative value is outweighed by the danger of unfair prejudice because any prejudice could be cured by a limiting instruction.  The District Court's ruling was incorrect, though as the Court upholds the Rule 404(b) ruling on "narrower grounds," and declines to address the transaction rule, I address only those issues addressed by the Court today.

***Rule 404(b)***

¶38   "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  M. R. Evid. 404(b).  Rule 404(b) bars admission of or reference to other acts for the purpose of supporting an inference of guilt based on conformance with prior bad character. *State v. McGhee*, 2021 MT 193, ¶ 14, 405 Mont. 121, 492 P.3d 518.  "The aim of Rule 404(b) is to ensure jurors do not impermissibly infer that a defendant's prior bad acts make that person a bad person, and therefore, a guilty person." *Madplume*, ¶ 22 (citing *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 (*Salvagni*)).  "Under Rule

404(b), the distinction between admissible and inadmissible other acts evidence thus depends on the particular purpose or effect of the evidence." *McGhee*, ¶ 15 (citing *Madplume*, ¶ 23). "To prevent the permissible uses from swallowing the general rule barring propensity evidence, the trial court must ensure that the use of Rule 404(b) evidence is 'clearly justified and carefully limited.'" *Madplume*, ¶ 23 (quoting *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648). "Rule 404(b) other acts evidence is admissible if the proponent can 'clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.'" *State v. Daffin*, 2017 MT 76, ¶ 15, 387 Mont. 154, 392 P.3d 150 (quoting *State v. Clifford*, 2005 MT 219, ¶ 48, 328 Mont. 300, 121 P.3d 489). "The policy underlying Rule 404(b)'s general prohibition comes into play whenever the nature of the evidence might tempt the jury to decide the case against the defendant on an improper propensity basis." *State v. Stewart*, 2012 MT 317, ¶ 62, 367 Mont. 503, 291 P.3d 1187 (citation omitted). The introduction of evidence of a defendant's other bad acts "creates the risk that the jury will penalize the defendant simply for his [] bad character." *State v. Croteau*, 248 Mont. 403, 407-08, 812 P.2d 1251, 1253 (1991).

¶39 In ruling that evidence of Stryker's later sexual touching of F.S. in Wyoming was admissible pursuant to Rule 404(b), the District Court found that Stryker's admissions to the Wyoming allegations showed "motive," "opportunity and pattern of behavior," and "absence of mistake or accident." Under Rule 404(b), evidence of other crimes, wrongs, or acts may be admissible to prove, among other things, an accused's motive, opportunity, preparation, plan, and the absence of mistake or accident. M. R. Evid. 404(b). While those

22

are enumerated exceptions to Rule 404(b), the proffered evidence must actually meet those exceptions to be admissible. In this case, it does not. Though the District Court gave other reasons it believed the Wyoming evidence was admissible, the Court today upholds the decision on "narrower grounds," Opinion, ¶ 16, specifically that the evidence shows Stryker's (1) motive and (2) plan and preparation.

### 1. Motive

¶40 "A 'motive' is a reason or rationale for doing or not doing something." *State v. Lake*, 2022 MT 28, ¶ 28, 407 Mont. 350, 503 P.3d 274 (citations omitted). "Evidence is admissible to show motive when separate acts can be explained by the same motive." *Daffin*, ¶ 19 (citing *Crider*, ¶ 25). "In [*Salvagni*], ¶ 59, we explained that a prior bad act may evidence the existence of a motive without supplying the motive. In such cases, the motive is the cause and both the prior acts and the act at issue are effects." *Crider*, ¶ 25 (citing *Salvagni*, ¶ 59).

¶41 The District Court found the "evidence of the subsequent acts of inappropriate and sexual touching tend to show that sexual attraction to the victim was the motive of the Defendant." We have previously allowed the admission of longstanding sexual fixations as motive evidence under Rule 404(b) in *Daffin* and *State v. Murphy*, 2021 MT 268, 406 Mont. 42, 497 P.3d 263. In *Daffin*, we found the "testimony of former victims and witnesses demonstrated Daffin's longstanding sexual fixation with underage teen girls, particularly living in vulnerable family situations, and provided the motive for his crimes" and that Daffin "pursued a sexual interest in underage females for approximately 20 years." *Daffin*, ¶ 20. In *Murphy*, Murphy was convicted of Incest for anally raping his half-sister

23

five years after he had admitted to sexually assaulting her when the two were children. *Murphy*, ¶¶ 2-6. Murphy had sought to bar the admission of the evidence of the juvenile sexual assault under Rule 404(b), but we found the "evidence demonstrates his sexual feelings were directed only toward [the victim], resulting in his sexual pursuit of her alone over a period of years," and that Murphy's "conduct and words do not merely demonstrate a general sexual desire, but a very particular one that led to a continuing course of conduct" termed a longstanding sexual fixation. *Murphy*, ¶ 14.

¶42 The proffered evidence in this case clearly does not demonstrate a "longstanding sexual fixation" in the vein of *Daffin* or *Murphy*. Here, "something further is necessary to demonstrate a cause and effect relationship" if the State seeks to use Stryker's later crime against him to prove motive for earlier acts. *State v. Blaz*, 2017 MT 164, ¶ 15, 388 Mont. 105, 398 P.3d 247. Rather than the years-long course of conduct we found could be used to prove motive in *Daffin* and *Murphy*, here we are presented with one incident in late April of 2019 in Colstrip and the Wyoming conduct occurring a month and a half later. Stryker admitted to the Wyoming incidents during questioning with Wyoming law enforcement and has pled guilty to child sexual abuse of F.S. in Wyoming. There is neither a longstanding course of conduct nor a longstanding sexual fixation at issue here, simply an alleged incident of sexual touching in Montana and later incidents in Wyoming.

¶43 When other bad acts evidence "is offered to prove a motive for the crime, courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury." *United States v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000) (internal quotation marks and citation omitted). Neither the District Court nor

24

this Court has been properly "on guard" to prevent the State from smuggling forbidden propensity evidence under the guise of motive in this case. The repeated admission of evidence of Stryker's admitted sexual touching of F.S. in Wyoming at trial simply invited the jury to improperly consider Stryker's propensity to commit the crime—he admits to molesting F.S. in Wyoming so he must have done it in Montana too. This is doubly true when the State did little or no investigation of the alleged incident in Montana—never even bothering to drive out to the ranch or to speak with any of the numerous people present that night. As an admitted child molester, understandably sympathies do not align with Stryker. But disdain of individuals charged with offenses, especially sexual offenses, against children should not drive the Court's continued erosion of the protections of the Montana Rules of Evidence. For those protections to continue to mean something, they must be applied even for a man like Stryker, who deserved to receive a fair trial on the allegation in Montana, not one based on his admissions in Wyoming. The District Court allowed the State to present improper propensity evidence under the guise of "motive" and therefore abused its discretion by admitting the evidence pursuant to the motive exception to Rule 404(b).

### 2. Plan and Preparation

¶44 Turning to the Court's declaration that "the Wyoming evidence was also admissible under Rule 404(b) to establish Stryker's specific pattern of behavior, sometime[s] referred to as *modus operandi* . . . or 'plan' and 'preparation' under Rule 404(b)." Opinion, ¶ 17. I would note that the "*modus operandi* theory of logical relevance is often used when the identity of the perpetrator is in doubt and the prior acts are so nearly identical in method as

25

to earmark them as the handiwork of the accused." *Madplume*, ¶ 24 (internal quotation marks and citation omitted). Stryker's identity has never been in doubt in this case and the acts are not of such a unique nature that they earmark them as the handiwork of Stryker. Regardless of the semantics involved, both the District Court and this Court appear to be focused on Stryker's pattern of behavior and concluding that it somehow evidences Stryker's plan to sexually assault F.S. I disagree. Rather, it supplies the jury with an impermissible character or propensity inference calculatedly designed by the State to compensate for its relatively weak presentation of evidence on the Montana charges. The District Court should have prevented the jury from drawing this impermissible inference and this Court should not condone the use of propensity evidence in this fashion.

¶45 The Court analogizes this case to that of *Madplume*, where we permitted evidence of a remarkably similar event which occurred two weeks *before* Madplume committed the deliberate homicide of his younger cousin while committing sexual intercourse without consent. In that case:

> on both occasions Madplume directed the parties to the same private plunge room at Wild Horse; on both occasions Madplume provided the alcohol and encouraged the alcohol use by both victims; in both cases Madplume brought along a younger cousin to make the victim feel more comfortable; in both cases Madplume maneuvered himself into intimate proximity with an isolated victim; and on both occasions the alleged sexual contact and altercations between Madplume and the victims took place while the younger cousin was out of the room.

*Madplume*, ¶ 26. We therefore found that the "circumstantial similarity and nearness in time of the two events were logically relevant to show Madplume's common plan, motive, and intent." *Madplume*, ¶ 26. Here, I fail to see how Stryker's later touching of F.S. at

26

their shared home in Wyoming gives any context to his "plan" or "preparation" to commit an earlier Incest in Montana while guests at another's home. It is logically incongruent to cite a *subsequently*/*later*-committed act as evidence, under any Rule 404(b) theory, to prove the defendant's *earlier* motive, plan, or intent to commit a *prior* criminal act. In my view, that manifest incongruity lays bare the intended and effectual improper propensity purpose of the after-the-fact Wyoming act.

¶46　　Concluding this case to be analogous to *Madplume* defies common sense. The touching of F.S. under her clothes is certainly not unique to the crime of incest; also, the circumstances surrounding the Colstrip and Wyoming incidents are clearly very different. Both Stryker and F.S. initially agreed the touching began during the last couple weeks of school in May of 2019, occurred at their home in Wyoming, and began with Stryker touching F.S.'s breasts, nipples, and buttocks, during back rubs, before Stryker later began going into F.S.'s bedroom and touching her vagina as well. It was during the second forensic interview that F.S. alleged that the escalation of the touching did not happen, but that Stryker touched everything during the first time he sexually touched her in Colstrip. Rather than escalating to touching F.S.'s vagina in a "safe" place—their Wyoming home— the allegation became that Stryker touched F.S.'s vagina the first time he ever inappropriately touched her and did it while they were guests in a house full of other people in Colstrip. In addition, there were three witnesses who maintained F.S. did not sleep with Stryker in the bedroom during the night in question but slept on the living room couch in the presence of two other people—testimony which would have undoubtedly been more influential had the evidence of Stryker's propensity for child molestation not already been

27

repeatedly before the jury. I disagree with the Court that this case is so analogous to *Madplume* that evidence of Stryker's *later* sexual touching of F.S. in Wyoming was admissible to prove "plan" or "preparation" for a *prior* offense.

¶47 The District Court abused its discretion by admitting evidence of Stryker's later crime under Rule 404(b) as the evidence was not admissible to prove motive, plan, or preparation. The evidence simply invited the jury to improperly conclude Stryker to have a propensity to sexually molest F.S. due to his later admissions to touching F.S. in Wyoming. The evidence of Stryker's Wyoming crime should not have been admitted under Rule 404(b).

### Rule 403 Balancing and the Limiting Instruction

¶48 I turn now to whether the probative value of the evidence is outweighed by the danger of unfair prejudice under Rule 403. The District Court found, in denying Stryker's motion in limine, that the probative value of Stryker's later admitted sexual contact with F.S. was not outweighed by the danger of unfair prejudice because any potential prejudice could be cured by a limiting instruction. At trial, the District Court repeatedly issued a limiting instruction when the Wyoming admissions surfaced again and again. I disagree that the probative value of the Wyoming admissions was not outweighed by the danger of unfair prejudice and, under the specific facts of this case, disagree with the Court that the limiting instruction cured any danger of the jury deciding the case on an improper basis.

¶49 Generally, relevant evidence is admissible. M. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

28

be without the evidence." M. R. Evid. 401. In addition, "[r]elevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant." M. R. Evid. 401. "M. R. Evid. 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Colburn*, 2018 MT 141, ¶ 16, 391 Mont. 449, 419 P.3d 1196 (*Colburn II*) (citing *State v. Ankeny*, 2018 MT 91, ¶ 33, 391 Mont. 176, 417 P.3d 275). While probative evidence is generally prejudicial to one side or the other, evidence is unfairly prejudicial if it arouses the jury's hostility or sympathy for one side without regard to its probative value, confuses or misleads the trier of fact, or unduly distracts from the main issues. *Madplume*, ¶ 33 (citations omitted). "The 'highly inflammatory' nature of child molestation evidence . . . require[s] the District Court and the State to tread with caution." *State v. Franks*, 2014 MT 273, ¶ 17, 376 Mont. 431, 335 P.3d 725 (quoting *State v. Van Kirk*, 2001 MT 184, ¶ 46, 306 Mont. 215, 32 P.3d 735).

¶50 The challenged evidence in this case—Stryker's admitted sexual touching of F.S. in Wyoming—was clearly highly inflammatory and of the type to arouse a jury's hostility towards Stryker. Both the District Court and this Court recognize it as such, focusing on the limiting instruction given six times by the District Court at trial.

¶51 "We have long recognized that adequate limiting instructions under M. R. Evid. 105 are often sufficient to eliminate, or at least reduce, the risk of unfair prejudice where prior bad acts evidence is both highly relevant and inherently prejudicial," but that may not always be so, such as when "the relative danger of unfair prejudice is high." *Lake*, ¶ 43

(citations omitted). We have also recognized that "juries are presumed to follow the law provided by courts." *State v. LaFournaise*, 2022 MT 36, ¶ 41, 407 Mont. 399, 504 P.3d 486 (citing *State v. Favel*, 2015 MT 336, ¶ 28, 381 Mont. 472, 362 P.3d 1126). Here, however, I believe the District Court's repeated reliance on the limiting instruction serves to highlight why the highly prejudicial and inflammatory evidence of Stryker's sexual touching of F.S. in Wyoming should not have been admitted in the first place. With the green light to make the trial primarily about the Wyoming allegations, the State did just that. Nearly every witness testified primarily about the Wyoming allegations—the ones who did not were the three who were in the house in Colstrip on the night of the alleged incident, who were never interviewed by Montana law enforcement. Six times the court gave the limiting instruction regarding Stryker's later bad acts, repeatedly highlighting this inflammatory evidence in the jury's mind. Under these circumstances, the repeated limiting instruction did not "eliminate or fairly reduce the manifest danger of unfair prejudice posed by the explicit and repetitive manner in which those highly inflammatory [] bad acts were put before the jury in this case," *Lake*, ¶ 43, but instead heightened and reinforced it. In this case, the evidence "was simply too prejudicial to be overcome by a cautionary instruction." *State v. Fleming*, 2019 MT 237, ¶ 35, 397 Mont. 345, 449 P.3d 1234. For three days, the jury was inundated with evidence Stryker committed sexual assault against F.S. in Wyoming after the time he was accused of the same in Montana. Each reference to these later acts made it "more likely the jury would convict because he had" sexually assaulted F.S. at a later time. *Fleming*, ¶ 35. "Under these circumstances, it is not possible to conclude that the cautionary instruction given by the District Court was

30

sufficient to mitigate the prejudicial impact" of the evidence of Stryker's later sexual assaults of F.S. in Wyoming. *State v. Sage*, 2010 MT 156, ¶ 42, 357 Mont. 99, 235 P.3d 1284. As the evidence should have been excluded for not meeting an exception under Rule 404(b), the District Court should have never needed to reach a Rule 403 analysis. When it decided to admit the improper propensity evidence, however, it should have been apparent that the limiting instruction was not enough to eliminate the danger of unfair prejudice due to the State's repeated introduction of Stryker's Wyoming admissions at trial and the evidence should have been excluded under Rule 403.

¶52 The Court, in conducting its Rule 403 balancing test, declares it significant that the State's Rule 404(b) evidence "demonstrated that Stryker had an attraction to F.S." Opinion, ¶ 21. As previously explained when analyzing the Court's "attraction" motive under Rule 404(b), "something further is necessary to demonstrate a cause and effect relationship" if the State seeks to use Stryker's later crime against him to prove motive for earlier acts. *Blaz*, ¶ 15. "[F]or evidence of prior crimes to be admissible to show motive or intent, 'the commission of the first crime or act should give rise to a motive or reason for the defendant to commit the second crime.'" *State v. Sweeney*, 2000 MT 74, ¶ 25, 299 Mont. 111, 999 P.2d 296 (quoting *State v. Weldy*, 273 Mont. 68, 75, 902 P.2d 1, 5 (1995)). Because the Court cannot find a "longstanding sexual fixation," which we have previously accepted for motive purposes under Rule 404(b) in *Daffin* and *Murphy*, in the evidence of this case, it drops the already low bar of Rule 404(b) to the ground by determining "attraction" is enough to demonstrate motive. In essence, the Rule 403 and 404(b) protections provided to defendants charged with sexual crimes in this state who have any

other sexual allegations—charged or uncharged, occurring before or after the alleged incident—are virtually eliminated going forward because the State may simply say the defendant was attracted to the victim and this Court will now accept that as providing a motive under Rule 404(b) and therefore sufficient probative value to override any Rule 403 protections. While "general hostility" may still not be found to provide a motive for a violent act because "without more, [it] would define motive very broadly and cast a wide net indeed for use of motive under Rule 404(b), potentially encroaching upon the impermissible use of motive as propensity evidence," *Blaz*, ¶ 15, the Court has determined it may entirely jettison that concept when it comes to sexual attraction in sexual assault cases. This Court, rather than being properly "on guard to prevent" the State from improperly using motive, has instead given the green light for the State to use "the motive label . . . to smuggle forbidden evidence of propensity to the jury." *Varoudakis*, 233 F.3d at 120. I believe this is a grave mistake.

¶53 Acknowledging Stryker raised a "legitimate concern," Opinion, ¶ 25, about the volume of Rule 404(b) evidence admitted at his trial, the Court nonetheless affirms his conviction. It does so while "continu[ing] to caution trial courts about limiting such evidence[.]" Opinion, ¶ 25. This is a logically incongruent caution when the Court has eviscerated the Rule 403 and 404(b) protections of those charged with sexual crimes in this state by allowing mere attraction as a permissible motive. When it comes to Rule 404(b) and motive in such cases, the limit appears to no longer exist.

¶54 The District Court erred by denying Stryker's motion in limine. I would reverse the denial of Stryker's motion in limine and remand to the District Court, to allow Stryker to

32

face a fair trial based on his alleged actions in Montana, not his later admitted actions in Wyoming.  I dissent.

/S/ INGRID GUSTAFSON

Justices Laurie McKinnon and Dirk Sandefur join in the dissenting Opinion of Justice Gustafson.

/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR